Gertrude Butler McCoy died testate, naming Pat McCoy, her husband, as executor of her estate. The will was admitted to probate. Pat McCoy qualified as executor and filed an inventory. Thereafter, William H. Pemberton, as supervisor of the inheritance tax and escheat division of the state of Washington, filed a motion for an order requiring the executor to list, as community assets of the estate, 2,400 shares of McCoy Investment Company, a corporation. The motion came on for hearing, evidence was taken, and the court, concluding that the shares in question did not belong to the estate, denied the motion. The supervisor appeals from the order.
The question to be determined is whether or not Mr. and Mrs. McCoy had made a valid gift of the shares in question to their four children, Wade B. McCoy, Mrs. Charles H. Black, Donald McCoy and Elizabeth McCoy.
[1] In approaching the problem, it must be borne in mind that there are three essential elements required to constitute a valid gift of personal property: (a) An intention on the part of the donor to presently give; (b) a subject matter capable of passing by delivery; and (c) an actual delivery at the time.
"The delivery must be such as will divest the donor of the present control and dominion over the property absolutely and irrevocably and confer upon the donee the dominion and control."In re Slocum's Estate, 83 Wn. 158, 145 P. 204; Dingley v.Robinson, 149 Wn. 301, 270 P. 1018.
The articles of incorporation of McCoy Investment Company were executed March 23, 1925, by Patrick McCoy, Charles H. Black and George V. Whittle. The articles provided for not less than three nor more than *Page 105 
five trustees. The three incorporators were named as trustees, to act for two months from the date of filing the articles. It was provided that "the capital stock . . . shall be two hundred and fifty thousand dollars divided into twenty-five hundred shares of the par value of one hundred dollars each." Paragraph seventh provided as follows:
"That the whole amount of said capital stock has been actually subscribed and the following are the names of the persons by whom the same has been subscribed:

 SUBSCRIBER NUMBER OF SHARES AMOUNT
Patrick McCoy 2498 $249,800.00
Charles H. Black 1 100.00
George V. Whittle 1 100.00"

The first meeting of the incorporators and subscribers was held April 4, 1925. The minutes of the meeting recite:
"The following incorporators and subscribers were present in person:
 NAME NO. OF SHARES
Patrick McCoy ................................................ 2498
George V. Whittle ............................................ 1
Charles H. Black ............................................. 1"

In the minutes appears the following resolution:
"RESOLVED, that the offer of Patrick McCoy to turn over assets to the approximate value of $850,000.00, which assets are adjudged and declared to be of such value by the Board of Trustees, and that the Vice-President and Secretary be and are hereby authorized to execute and deliver such agreement or agreements as may be necessary for the purchase of such property in accordance with said offer and furthermore that the Vice-President and Secretary be and are hereby directed to issue and deliver in payment for said assets, certificates of full paid capital stock of this corporation to said Patrick McCoy or his nominees for an aggregate of twenty-five hundred (2500) shares." *Page 106 
There also appears a list of the assets so offered and accepted. They consist of:
Marketable Securities
at First National Bank, Seattle, Wash ................... $250,000.00
Cash in Banks
 First National Bank, Seattle ........................... 2,500.00
Balance on Timber Contract
 Webb Logging Company ................................... 75,000.00
Loans (Notes)
 (Follows a list of 19 individual notes of
 persons and corporations) .............................. 141,054.00
Timber
 (Follows a list of 3 timber holdings) .................. 80,000.00
Stock
 (Follows a list of holdings in 9
 corporations) .......................................... 180,300.00
Real Estate
 (Follows a list of descriptions of real
 estate conveyed to the company by "Pat
 McCoy and Gertie McCoy.") .............................. 92,500.00

The assets listed comprised all of the property of Mr. and Mrs. McCoy, except their home.
From the stock book, it does not appear that any certificate was ever issued to Patrick McCoy for 2,498 shares. In fact, it appears that no certificates were issued until June 1, 1925. Under that date, certificates of one share each were issued to Wade B. McCoy, Charles H. Black, George V. Whittle and E.C. Million. These certificates were obviously issued to qualify the persons named to act as trustees. For on June 2, 1925, at the first annual meeting of the stockholders, they and Patrick McCoy were elected trustees of the corporation. That was the only business transacted at the meeting. At the trustees' meeting immediately following, Patrick McCoy was elected president and treasurer; Wade B. McCoy, first vice-president; Charles H. *Page 107 
Black, second vice-president; and George V. Whittle, secretary. These same officers were thereafter reelected annually. The same persons were elected as trustees until 1932, when John L. Corrigan was elected to succeed E.C. Million. The stock certificate issued to the latter was canceled, and a certificate for a qualifying share was issued to Corrigan June 23, 1932. In the meantime, the following certificates were issued:
 July 7, 1925, 250 shares to Wade B. McCoy July 7, 1925, 250 shares to Mrs. Charles H. Black July 7, 1925, 50 shares to Donald M. McCoy July 7, 1925, 50 shares to Elizabeth McCoy July 7, 1925, 1896 shares to Patrick McCoy.
The latter certificate is marked: "Cancelled July 7, 1925."
On September 7, 1928, the following certificates were issued:
 350 shares to Wade B. McCoy 350 shares to Mrs. Charles H. Black 550 shares to Donald McCoy 550 shares to Elizabeth McCoy 96 shares to Patrick McCoy.
None of the children ever had in his possession any of the certificates issued to him. For aught that appears in the record, none of the children, except Wade B. McCoy, ever knew that the certificates had been issued.
The certificates were left in the custody of the secretary, George V. Whittle, who described his functions as follows:
"A. I am a so-called expert on tax matters and supposed to know the law and regulations. Q. Isn't that the purpose of your service in these matters? Read my former question. (Question read as follows: `And it is your business to so arrange matters so they don't have to pay taxes, or if they do have to pay they pay the very least amount, isn't that what you mean when *Page 108 
you say you are an expert?') A. It means that a person who is an expert takes advantage of all legal technicalities of the law. Q. This is the way you have this arranged: you advised them that they wouldn't need to pay inheritance tax if one of them died after this arrangement, did you? A. No. Q. Was there any question of taxes discussed between you and them in making these plans? A. No, not at that time. Q. You are an expert, and that is your business, to keep people from paying taxes, and when they come to you you don't even discuss the matter? A. Mr. McCoy wanted to make a distribution to his children, and the proper method, in order to keep the thing going legitimately and properly for all time, was to form a corporation and do it that way. Q. Why didn't you tell him to just give it outright and let them have it? A. Because it was scattered all over the place. You couldn't make an equitable division, you couldn't possibly make an equitable division. Q. Couldn't make an equitable division? A. No, and come under the gift act. Q. Oh, you did discuss taxes then, about the gift tax? A. Yes, so far as the gift tax was concerned, yes. Q. Nothing about the inheritance tax at all? A. No. Q. So this arrangement was not perfected by you to prevent the payment of inheritance? A. Not necessarily, no. Q. What do you mean by that, not necessarily? A. Well, no, it wasn't at that time."
He also testified (as did Patrick McCoy and Wade McCoy) that the certificates were left with him with the understanding that they should be delivered to the children on demand. In other words, the inference desired for us to draw is that Patrick McCoy delivered the certificates to Whittle as agent for the children. But the uncontroverted facts with respect to the management of the company's business do not, in our opinion, admit of any such inference. Patrick McCoy completely dominated the company's affairs. Through the years of the company's existence, Mrs. McCoy and the children had charge accounts at various stores, which were paid monthly by Patrick McCoy with company *Page 109 
checks. In addition, money was given to the children in varying amounts. The living expenses of the Patrick McCoy household were paid with company funds. Mr. Whittle testified:
"Mr. McCoy would issue checks to the various individuals from time to time and pay all their living expenses, and clothing, and every other thing, cars, and whatnot, any expenses."
At the annual meeting each year, a dividend was declared in the amount of the total of such expenditures. This dividend, however, was wholly credited to Patrick McCoy, who reported it each year in his income tax return to the Federal government. Again, Whittle testified:
"We would declare a dividend up to the amount of the drawings for the entire family during the year . . . We wouldn't equalize it . . . at all. It was never equalized . . . Mr. McCoy reported the entire drawings as a dividend in his tax return."
In other words, the property, income and dividends were at all times handled by Patrick McCoy, without regard to any supposed interest the children had in the capital stock.
The annual meeting was a perfunctory affair, always attended by Patrick McCoy and (with one exception) his income tax expert, George V. Whittle, and his attorney, E.C. Million, and later John L. Corrigan. Wade McCoy, personally, attended only three of ten annual meetings. The ordinary routine of the annual meeting was approval of the minutes of the previous meeting, approval of the audit report, declaration of the dividend, and election of trustees. In five out of the ten meetings, the routine was varied by voting Patrick McCoy a salary as president. The total amount so authorized was $61,800. Yet it appears from the financial *Page 110 
statement of the company that in the ten years Patrick McCoy drew in salary $86,400.
Further evidence that Patrick McCoy at all times dominated the affairs of the company is found in the following resolution adopted by the board of trustees on October 20, 1930:
"WHEREAS in the regular course of business it is necessary for this corporation to purchase and sell the stocks of various other corporations, and
"WHEREAS such stocks when purchased are registered in the name of the this corporation, NOW THEREFORE,
"BE IT RESOLVED that Pat McCoy, president of this corporation, be empowered and hereby is empowered to assign and transfer such stock for and on behalf of this corporation."
In our view, the whole course of conduct of Patrick McCoy in the management of the affairs of the corporation is incompatible with an intention on his part "to presently give" the certificates of stock to the children. On the contrary, it seems clear to us that Whittle held the stock certificates as agent for Patrick McCoy, and not as agent for the children. Thus there are absent two elements necessary to a valid gift.
[2] There is, however, another failure in the evidence to establish the validity of the alleged gifts: Authority of Patrick McCoy to make a gift of community property. While a husband has the management and control of community personal property, he cannot give it away. Marston v. Rue, 92 Wn. 129,159 P. 111. In other words, to sustain the validity of these alleged gifts, it must appear that Gertrude McCoy authorized the issuance and delivery of the stock certificates to her children. We find no competent evidence in the record that she ever, by word or deed, authorized the issuance or delivery of the stock. Only by the most extravagant inference could it be said that she even knew of the existence of the corporation. The *Page 111 
nearest approach to evidence of any knowledge on her part concerning the transaction is found in the following testimony of Patrick McCoy:
"Q. Did you and your wife ever discuss the matter of making a gift or transfer to your children while you were both alive? A. She said it was all right, yes. Q. What was the net result of those discussions between yourself and her? A. Whatever I done was all right with her, and whatever she done was all right with me. Q. And what plan did you make, if any, with reference to how you would divide it among the four children? A. Well, when we had the company, you know — we incorporated a company to do that, you know. Q. Were you going to make an equal division or not? A. Yes."
Assuming an intention on the part of Patrick McCoy "to presently give" and "an actual delivery," would the gift have been binding on Mrs. McCoy had she ever questioned it? Assuredly not. Parker v. Parker, 121 Wn. 24, 207 P. 1062. Before one can be said to have assented to or authorized a gift, there must at least be some showing of knowledge on the part of the donor concerning the existence of the specific property subject to gift. Without such knowledge, how could there exist an intention to "presently give" it away?
[3] With respect to the certificate for 250 shares issued in the name of Wade B. McCoy on July 7, 1925, a contention is made which requires particular notice. For some years prior to 1923, Patrick McCoy was actively engaged in logging operations, being half owner in McCoy-Loggie Timber Company. In that year, that company's properties were sold. As a result of the sale, McCoy received $420,060. Of this, it is asserted $168,024 belonged to Wade B. McCoy. Patrick and Wade both testified that in 1919 the former gave the latter 200 shares of stock in the McCoy-Loggie Timber *Page 112 
Company. They testified that in 1922 there was an additional gift of 800 shares. The theory is that $168,024 was the amount of Wade's interest in the net proceeds derived from the sale of the McCoy-Loggie Timber Company's properties. Wade testified that he did not draw any part of the $168,000 at the time of the sale, but that, in July, 1923, he took $75,000 and invested it in the McCoy-Wilson Company, Limited, of British Columbia. "The rest of it was left in the pot," he said. Neither of the certificates of stock made out to Wade was ever delivered to him or any agent of his. He testified he never even saw them. So there was no valid gift of the stock under the rule of In re Slocum's Estate,supra.
 [4] So far as the proceeds from the sale of the McCoy-Loggie Timber Company are concerned, the most that can be said was that a gift of $75,000 was consummated by delivery. Even as to this $75,000, however, we do not find any evidence tending to show that Mrs. McCoy authorized the gift, or that she knew anything about it. Furthermore, we have considerable doubt as to whether Patrick McCoy ever entertained an intention "to presently give" the money to Wade. For, as we have seen, Wade testified that he took that amount of the proceeds and invested it in the McCoy-Wilson Company. This was in July, 1923. In this connection, it is interesting to note that among the assets turned over to the McCoy Investment Company by Patrick McCoy in 1925 are two notes of McCoy-Wilson Company, Limited, — one for $50,000, and one for $25,000. And Patrick McCoy testified as follows:
"Q. After you sold out the property of the McCoy-Loggie Company in 1923 did you go back into business again? A. Well, we got an offer in — in with Wilson there in Vancouver, B.C.Q. But you personally didn't take any part? A. No, but I put some money in it to get it going. We are in it yet, too. Wade is there." *Page 113 
Our conclusion is that all of the stock of McCoy Investment Company was the community property of Patrick McCoy and Gertrude Butler McCoy at the time of the latter's death. Therefore, it must be inventoried as an asset of her estate.
The order appealed from is reversed.
HOLCOMB, STEINERT, GERAGHTY, and MAIN, JJ., concur.