[No. 27274. *En Banc.* June 22, 1939.]

WILMON TUCKER, *as Administrator, Appellant,* v. SADIE R. BROWN *et al., Respondents.*[1]

[1]Reported in 92 P. (2d) 221.

*Allen, Froude & Hilen* and *Rummens & Griffin*
(*George B. Guthrie* and *P. J. Gallagher,* of counsel),
for appellant.

*Bonsted & Nichoson, F. C. Palmer, Jr.,* and *Poe,
Falknor, Emory & Howe,* for respondents.

MAIN, J.—This action was brought to have a trust
declared, and also for an accounting. The defendants
answered, with certain admissions and denials, and
affirmatively pleaded the statute of limitations and
that the property in controversy was transferred as a
gift. The trial was to the court without a jury, and
resulted in a decree dismissing the action. From this
decree, Wilmon Tucker, as administrator with the will

annexed of the estate of Sarah E. Smith, deceased, appealed.

The facts will only be stated in so far as it appears necessary to present the questions which are controlling upon this appeal. It may be stated that the respondent Guaranty Trust Company, as administrator *de bonis non* with the will annexed of the estate of Reese B. Brown, deceased, is the principal respondent.

At the time the transactions here involved took place, Sarah E. Smith, deceased, was about seventy years of age, if not a little more. She was a very wealthy woman, having money, bonds, securities, and other property, which, the appellant says, would amount to $1,600,000, and the respondent says that it would be less than $1,000,000. The exact amount is not material at the present time.

Reese B. Brown was a shrewd, energetic, and capable business man. During the latter part of the year 1928, Mr. Brown had been negotiating for some time for the purchase, either for himself or another, of two apartment hotels in the city of Seattle, and during the time that these negotiations were carried on, he had frequent conferences with the manager of the hotels. When those negotiations were nearing a conclusion, as testified to by the manager,

"He [Mr. Brown] said 'As soon as I get this Daly deal over I am going after that fortune of Mrs. Scollard [Mrs. Smith].' He said he didn't know her. I said 'How are you going to get acquainted with her?' He said 'You leave that to me. I have never started out for anything unless I finished it'."

Subsequently, Mr. Brown became acquainted with Mrs. Smith, with the result that, during the year 1929, she turned over to him at least $350,000 in cash. Mrs. Smith and the Brown family, consisting of Mr. Brown,

his wife Sadie R. Brown, and a son of high school age, became very friendly. February 14, 1930, Mrs. Smith withdrew from a bank in the city of Seattle approximately five hundred thousand dollars worth of bonds or securities which had been left in the bank for safe-keeping, and at the same time withdrew the balance of her money deposit, which was a large amount. These were turned over to Mr. Brown. As a result of the transactions mentioned, it appears that Mrs. Smith had turned over to Mr. Brown all her money, securities, and property of every description. She subsequently stated that Mr. Brown had possession of her property, but she had control of it.

During the year 1930, the Federal internal revenue officers began an inquiry to determine whether Mrs. Smith was paying the amount of income tax that she should. In pursuit of this inquiry, a safe deposit box in Kansas City, Missouri, was attached, and subsequently opened. It contained fifty-three one thousand dollar bills and some other currency of smaller denominations. Afterwards, and in the city of Seattle, the internal revenue officers interrogated Mrs. Smith as to her income, and she refused to produce, for their inspection, certain bonds and securities. At the request of the officers, a subpoena was issued out of the Federal court, but before it could be served, Mr. Brown had hastily taken Mrs. Smith to the city of Vancouver, in British Columbia, where she remained until about the middle of November following. During the time that Mrs. Smith was in Vancouver, Mr. Brown was also there a substantial portion of the time.

October 24, 1930, Mrs. Smith went before a notary public and signed and verified what is referred to here as exhibit No. 50. November 8, 1930, she went before the same notary and signed and verified what is referred to as exhibit No. 52. These exhibits will sub-

sequently be referred to. After these documents were executed and, as indicated, about the middle of November, Mrs. Smith returned to the city of Seattle and shortly thereafter went with Mr. Brown and his family to the city of Los Angeles, in California, where a house was rented, in which they resided until sometime during the year 1931. After leaving Los Angeles in 1931, Mr. Brown and Mrs. Smith visited a number of cities, and later, after they had both been indicted by the Federal grand jury, sitting at Seattle, for failure to make proper income returns, they started on a trip east, and, as Mrs. Brown says, "they did not want to be traced on that trip." After arriving in an eastern city, they were joined by Mrs. Brown and the son Fred. From there, they went over to Canada, where the Browns were registered under an assumed name and Mrs. Smith was registered, not as "Sarah E.," but as "Mrs. J. R.," giving the initials of her first husband, who had died many years before. Mrs. Smith remained in Canada at a hotel in Quebec for a time, and then at a hotel in Montreal until her death on July 24, 1932.

The Browns returned to the state of Washington, Mr. Brown in the meantime visiting Mrs. Smith on one or more occasions. When Mrs. Smith became seriously ill in Montreal, Mr. Brown was notified and went to that city. He took charge of the remains, had the body cremated, the ashes placed in an urn, and brought them back with him, and the urn was kept in his home, without the knowledge of anyone outside of the Brown family, until after his death. Mr. Brown died as the result of an automobile accident January 27, 1934.

The principal question upon this appeal is whether Mrs. Smith had made a gift to Mr. Brown of all her money, bonds, securities, and other property.

It will be admitted that the owner of property has a right to give it away to whomsoever he desires, and that the law is now less strict with reference to establishing gifts than formerly and, it may be said, favors the disposition of property by gift, the same as though the donor had undertaken to dispose of his belongings by the stricter formality of a written disposition. But before a gift can be sustained, certain things are essential.

In order to constitute a gift of personal property, it is necessary (a) that there be an intention on the part of the donor to personally give; (b) a subject-matter capable of passing by delivery; (c) an actual delivery at the time; (d) the delivery must divest the donor of present dominion and control over the property absolutely and irrevocably and confer upon the donee the dominion and control; and (e) a gift will not be presumed, but he who asserts title by this means must prove it by evidence which is "clear, convincing, strong, and satisfactory." *Jackson v. Lamar*, 67 Wash. 385, 121 Pac. 857; *In re Slocum's Estate*, 83 Wash. 158, 145 Pac. 204; *Newsome v. Allen*, 86 Wash. 678, 151 Pac. 111; *Dingley v. Robinson*, 149 Wash. 301, 270 Pac. 1018; *In re McCoy's Estate*, 189 Wash. 103, 63 P. (2d) 522.

Prior to the time that exhibits 50 and 52 were executed, there is no evidence from which it could be concluded that Mrs. Smith ever made a gift to Mr. Brown of her money, bonds, securities, and other property. If a gift can be sustained, it must be by reason of the two exhibits mentioned. Without so deciding, it will be assumed (a) that these exhibits were executed in the absence of any undue influence; (b) that they were signed by Mrs. Smith; and (c) that, prior to her death, a legal delivery had been made of them.

Exhibit 50 reads as follows:

"KNOW ALL MEN BY THESE PRESENTS that I Sarah E. Smith, of the Exeter Apt. Hotel of the city of Seattle, in the State of Washington, and temporarily of the city of Vancouver, British Columbia, do hereby acknowledge and declare that whatever and all sums of money I have heretofor given to my friend Reese B. Brown, of the city of Seattle, have been given by me to him is an absolute gift and I do further declare whatever shares, of stocks or other securities for money, I have heretofore given to the said Reese B. Brown, have been given by me to him as an absolute gift. The said shares, stocks or securities for money are particularly set forth in the schedule hereto attached.

"This is of my own free will and it is being done while my mind is clear and I have all my reasoning faculties and the relation that exists between us is identical of that of mother and son.

"WITNESS my hand and seal at the said city of Vancouver, this the 24th day of October, 1930.

"WITNESS: J. R. HENLEY      SARAH E. SMITH      Seal

"Province of British Columbia

"County of Vancouver.

"To Wit

"On this 24th day of October, 1930, personally appeared before me the above mentioned Sarah E. Smith, who is personally known to me and has acknowledged to me that she executed the above mentioned document as her free act and deed.      C. E. ROBSON,

A Notary Public in and for the Province of British Columbia."

To this exhibit was attached a schedule of bonds, securities, and other property.

It will be observed that this document does not purport to then make a present gift, but to acknowledge and declare that whatever sums of money had "heretofore" been given to Mr. Brown had been given to him as an absolute gift; and, likewise, whatever stocks and other securities "heretofore" given had been given to Mr. Brown as an absolute gift. There is nothing in this writing to indicate a then present intention to give,

but only to confirm that which had previously been given; and, as we have seen, there is no evidence that, prior to the execution of this document, Mrs. Smith had given Mr. Brown the property in controversy. A document which purports to confirm a gift to someone, made in the past and of which there is no evidence, and not to make a then present gift, cannot be held to be effective in transferring the title to the property.

■ Turning now to exhibit 52, which was executed November 8, 1930, or fifteen days after exhibit 50. This exhibit reads as follows:

"DOMINION OF CANADA ⎫ ss.
   PROVINCE OF B. C. ⎭

"AFFIDAVIT

"SARAH E. SMITH, being first duly sworn, deposes and says:

"That, during the Calendar year of 1929, I advanced to REESE B. BROWN, cash sums of money in the aggregate amount of approximately Four Hundred and Eighty-Five Thousand Dollars ($485,000.00): and at the time of said advances were made to Brown, they were, and each was considered as a loan to said Brown to be used by him or invested for his benefit as he might deem proper. That, at the time said advances were so made, the same was not considered or intended to be, or evidence, an investment on my behalf.

"That no part of said advances has been repaid to me by said Brown, and no interest thereon has been paid, or other consideration rendered to me for the use of said money.

"That, in the year 1930, to wit, in the month of October of said year, I decided to cancel and release all obligation of said Brown to repay the said advances to me, or to account to me in any manner for the same or any earnings or profits thereon, and to make said Brown a gift of said funds so advanced, and all thereof.

"That, heretofore, at hearings had before the United States Internal Revenue officers, I testified under oath, and filed affidavits, as I recall, stating the fact of my so making said advances and loans above referred to:

and, also, at a hearing so had, I stated under oath that said Brown was not indebted to me at the present time, or at the time of said hearing. That each and both of said statements as so made by me are true and correct, for the reason, that the statement so made that I had loaned to said Brown the said moneys evidenced the fact which existed at the time said advances were made, as they were then considered as loans: and the statement above referred to that said Brown is not now indebted to me was true, in view of the fact that I had heretofore made to him a present of said funds and have released and cancelled his obligation to repay the same.

"Witness:                                    SARAH E. SMITH

"C. E. ROBSON

"675 Dominion St.

"Vancouver, B. C.

"Subscribed and sworn to before me this Eighth day of November, 1930.                    C. E. ROBSON

"Notary Public for the Province

" (Notarial Seal)         of British Columbia, Dominion of Canada."

It will be observed that this exhibit recites that during the year 1929, Mrs. Smith had advanced to Mr. Brown cash sums in the aggregate amount of $485,000, and that the advances were made as a loan. In exhibit 50, it was stated that all sums that had been transferred to Mr. Brown had been made as gifts. The two documents do not appear to be consistent in this regard. The document then recites that no part of said advances have been repaid, and, following this is, that, in the year 1930, in the month of October,

"I decided to cancel and release all obligation of said Brown to repay the same advances to me, or to account to me in any manner for the same or any earnings or profits thereon, and to make said Brown a gift of said funds so advanced, and all thereof."

The document says that Mrs. Smith, in the year 1930, and in the month of October of that year, had

"decided" to make Mr. Brown a gift of the funds advanced. Even if the amount specified in this exhibit was a loan, the document is not sufficient to cancel Mr. Brown's obligation to repay. It recites that Mrs. Smith, in the year 1930, had "decided" to cancel and release all obligation of Mr. Brown to repay, but nowhere does the agreement use language which would operate to cancel the debt, if there was one. A gift of a chose in action, not having such tangible body as to be chattel property,

". . . including a gift of a simple debt, cannot be made effective without a deed, the execution of an adequate release or transfer in writing, or the performance of some other act placing the debt beyond the legal control of the creditor." *Millett v. Temple,* 280 Mass. 543, 182 N. E. 921, 84 A. L. R. 378; *Adams v. Merced Stone Co.,* 176 Cal. 415, 178 Pac. 498, 3 A. L. R. 928; *In re Antkowskis' Estates,* 286 Ill. App. 184, 3 N. E. (2d) 132. It necessarily follows that exhibit 50, as already indicated, cannot be held to be sufficient in its terms to make a then present gift at the date of its execution, and exhibit 52 does not contain language which, under the rule stated, would operate to cancel the debt therein mentioned, if there was such indebtedness.

However, if either one or both of these documents do not clearly bear the construction which we have placed upon them, and they are assumed to be ambiguous, the construction which the parties put upon them by their words or conduct will be given weight in determining the meaning intended. *Amherst Inv. Co. v. Meacham,* 69 Wash. 284, 124 Pac. 682; *Tone v. Parlaman,* 154 Wash. 389, 282 Pac. 208; *Fleming v. Buerkli,* 159 Wash. 460, 293 Pac. 462.

After the exhibits referred to were executed, so far as the evidence shows, Mrs. Smith never stated to

anyone that she had given all of her property to Mr. Brown, and Mr. Brown never stated that she had given it to him. When the internal revenue officers inquired of Mrs. Smith about the money in the Kansas City safe deposit box, she said, unequivocally, that it was her money, and that she had not given it to Mr. Brown. Mr. Brown did not claim that it was his money, but, as one of the officers testified, reluctantly admitted that it was not. After Mrs. Smith was taken over to Canada and kept in seclusion for the purpose of keeping the Federal internal revenue officers from locating her, she repeatedly made statements, to employees in the hotels where she stopped, that she was very wealthy. When Mr. Brown went over to Canada at the time of the death of Mrs. Smith, he stated to two or more persons that Mrs. Smith was worth "an awful lot of money," and that he was managing her affairs. September 29, 1933, more than a year after Mrs. Smith's death, while Mr. Brown was adjusting, with a special attorney of the treasury department, the matter of the income tax of Mrs. Smith, he said that Mrs. Smith had not given him any of her money or property.

The fact that Mrs. Smith was willing to hasten out of the jurisdiction of the United States and go over into Canada for the purpose of escaping the Federal income tax officers is inconsistent with the theory that she had made a gift of her property to Mr. Brown, because, had she made such a gift, there would be no reason why she was seeking to evade the officers. Whatever view may be taken of the situation, the record in this case, under the law, would not justify a holding that there had been a gift.

■ As to the statute of limitations, it is conceded that it would not run against an express trust until the termination thereof or its repudiation by the trustee.

■ An express trust is one created by the act of

the parties; and, where a person has, or accepts, possession of money, promissory notes, or other personal property with the express or implied understanding that he is not to hold it as his own absolute property, but to hold and apply it for certain specified purposes, an express trust exists. *Farrell v. Mentzer,* 102 Wash. 629, 174 Pac. 482; 65 C. J. 295; *Allen v. Hendrick,* 104 Ore. 202, 206 Pac. 733.

A person occupying a fiduciary relation, who has property deposited with him on the strength of such relation, is to be dealt with as a trustee of an express trust. *Moulden v. Train,* 199 Mo. App. 509, 204 S. W. 65.

In the case now before us, it seems clear that a fiduciary relationship existed between Mrs. Smith and Mr. Brown. Such a relationship is said to exist "where confidence is reposed on one side and resulting superiority and influence on the other." *Rubin v. Midlinsky,* 321 Ill. 436, 152 N. E. 217. There can be no question but that Mrs. Smith reposed complete and absolute confidence in Mr. Brown, which resulted in his influencing or controlling all of her actions. His was the superior intelligence and the dominating influence. It is true that Mrs. Smith was in some respects a very shrewd and capable woman; in others, she was credulous and easily influenced. It is difficult to believe that Mrs. Smith would have turned over all of her property to Mr. Brown, as she did, without there being a fiduciary relationship between them.

In an affidavit (exhibit 12), made on the first day of September, 1930, before a notary public in Coeur d'Alene, Idaho, where she was accompanied by Mr. Brown, it is recited that she had loaned Mr. Brown $485,000, and that she had entrusted him with money, securities, and valuables to be kept "in trust" for her.

The decree appealed from will be reversed, and the

cause remanded for further proceedings not inconsistent with what has been said in this opinion.

BLAKE, C. J., MILLARD, GERAGHTY, and JEFFERS, JJ., concur.

BEALS, J., concurs in the result.

STEINERT, J. (concurring)—While I concur in the result of the majority opinion, I do not subscribe to its initial and primary theory.

The opinion holds (1) that exhibit 50 became ineffectual because it indicated merely an intention to *confirm* a gift made in the past, rather than an intention to make a gift *in praesenti,* and (2) that exhibit 52 did not operate to cancel Brown's obligation to repay the loan or advance which he had obtained from Mrs. Smith.

The substance of the opinion with respect to exhibit 50 is contained in the following sentence:

"A document which purports to confirm a gift to someone, made in the past and of which there is no evidence, and not to make a then present gift, cannot be held to be effective in transferring the title to the property."

In my opinion, a document signed and sealed in the presence of a witness, and acknowledged by the subscriber as her free act and deed, is, of itself, on delivery of the instrument, conclusive evidence of the facts therein alleged and operates, not as a present vehicle of conveyance or transfer, but as a solemn acknowledgment that such transfer has actually been made in the past and a confirmation of its binding effect upon the subscriber. It thereafter estops the affiant and her representative from asserting the contrary.

With reference to exhibit 52, the majority propounds a rule of law as contained in the following sentence:

"A gift of a chose in action, not having such tangible body as to be chattel property, 'including a gift of a simple debt, cannot be made effective without a deed, the execution of an adequate release or transfer in writing, or the performance of some other act placing the debt beyond the legal control of the creditor'."

Accepting this as a correct statement of the law, I am of the opinion that the document, so far as its *execution* was concerned, fully complied with the requirements of the rule, in that it was, in form, an adequate release in writing. In the concluding lines of the instrument, and just preceding her signature, Mrs. Smith made a sworn declaration affirming her former statement under oath that Brown was not indebted to her, in view of the fact, as she says, "that I had heretofore made to him a present of said funds and *have released and cancelled his obligation to repay the same*." (Italics mine.)

From and after the delivery of that instrument, Mrs. Smith herself would have been estopped to deny that she had released the obligation, and her representative is, of course, in no stronger position.

These two documents verify and confirm, with accuracy and precision, transactions that took place in the past, together with the results intended thereby. The majority opinion, however, holds that these instruments have no valid legal effect. The law does not require the doing of a vain or useless thing. If a man has made a gift or forgiven a debt, but in a manner which the law, according to precedent, does not recognize, and he thereafter desires to give his act subsequent legal effect, the law should not require him to undo that which he has intentionally done and compel him to do it over again, when a sufficiently legal and ready way is afforded by the execution and delivery of a formal written confirmation of his prior act. I

am unable to adopt the theory or follow the reasoning of the majority.

However, I am convinced that the ultimate result at which the majority has arrived is right. My reasons, founded upon the record, may be stated briefly.

Prior to the time of the execution of the two documents in question, in October and November, respectively, of 1930, Mrs. Smith had delivered to Brown (1) over a half-million dollars in United States currency and gilt-edge securities valued at nearly an equal amount, all of which was received and was to be held by Brown in trust for Mrs. Smith, and (2) the sum of $485,000 as a loan to Brown, without security and without written evidence thereof. From 1929, and prior to the delivery to him of these moneys and securities, to the day of Mrs. Smith's death in July, 1932, Brown acted as her confidential adviser and manager of all her business and financial affairs. The mutual relations of Mrs. Smith and Brown with respect to the money and securities entrusted or loaned by her to him never changed, unless it be held that a radical and vital change was effected by the two instruments under consideration.

Respondents' affirmative defense to the appellant's complaint was that the property belonged to Brown as a gift from Mrs. Smith. The burden was, therefore, upon respondents to prove the affirmative issue raised by them.

One asserting title by gift must prove it by evidence which is "clear, convincing, strong, and satisfactory." Proof, of the required degree, must be made of every element relied upon to constitute or establish the gift.

The principal links in respondents' chain of proof were the two documents designated exhibits 50 and 52. It was, therefore, incumbent upon respondents to prove the execution and delivery of those documents, by evi-

dence that was clear, convincing, strong, and satisfactory.

I am convinced, from a reading of the record, that the proof of execution of the instruments fully met the requirements of the rule. Although there was an insinuation that Mrs. Smith's signatures to the instruments were forgeries, the evidence is overwhelmingly, and almost conclusively, to the contrary. The genuineness of the signatures was established by the testimony of those who had seen her sign them, also by comparison with admittedly genuine signatures and by expert testimony. The identity of Mrs. Smith as the person who signed the instruments was likewise established to the absolute satisfaction of the trial court.

I am equally convinced, however, that the proof of the *delivery* of the instruments by Mrs. Smith to Brown failed to meet the requirements of the rule. According to the witnesses who were present at the time that the instruments were signed and who assisted Mrs. Smith in their execution, the instruments, on completion, were handed to Mrs. Smith; Brown was not present at the time. According to the testimony of Mrs. Brown and her son, the instruments were discovered by one of them nearly four years later in a desk in their home; this was eighteen months after Mrs. Smith's death and a month or two after the death of Brown. There is no evidence whatever as to when or how or why the documents went out of the physical possession of Mrs. Smith or came into the possession of Brown. There is no evidence as to whether Brown was the custodian of the instruments for Mrs. Smith, as he had been of all her other papers and securities, or whether, on the contrary, he held them as his personal property in consequence of a delivery to him by Mrs. Smith.

All that we have in the way of proof, or the equivalent of proof, with respect to delivery of the documents, is a presumption of law arising from possession. But that presumption only served to make a *prima facie* case on the particular issue. It was still the burden of respondents to establish the facts showing a gift, by evidence that was clear, convincing, strong, and satisfactory.

One of the elements necessary to a completion of the chain of proof was the *delivery* of the documents by which the gift was confirmed. So far from meeting the burden, the inferences to be drawn from the evidence were decidedly to the contrary. If, as contended by respondents, title to the property had passed, or could be considered to have passed by confirmation, from Mrs. Smith to Brown by virtue of the execution and delivery of the confirmative instruments in 1930, it was wholly unnecessary thereafter to secrete Mrs. Smith in a foreign country to escape investigation by local Federal authorities.

In addition to that, the record is replete with evidence to the effect that Brown continued to represent, and to assert that he represented, Mrs. Smith in the conduct of her financial affairs, and, further, to the effect that, on frequent occasions throughout the lifetime of Mrs. Smith, he declared that she was an exceedingly wealthy woman. His whole conduct was consistent only with the theory that title to the property had not passed to him, and that his possession of the documents in question was merely that of a custodian for Mrs. Smith and not that of a holder in his own right. The presumption arising from possession was utterly shattered by the evidence bearing upon the subject, and restored to the respondents the burden originally assumed by them. Since that burden was

not met, the affirmative issue raised by respondents was not supported and the case of the defense falls. Upon this theory, I concur in the result.

ROBINSON and SIMPSON, JJ., concur with STEINERT, J.

[1]Reported in 92 P. (2d) 228.