[No. 30602.   Department Two.   November 12, 1948.]

*In the Matter of the Estate of* ROBERT OTTO GALLINGER, *Deceased.*

F. E. VOGLESON, *Appellant,* v. A. F. COTTIN, *Respondent.*[1]

[1]Reported in 199 P. (2d) 575.

*Geo. H. Crandell,* for appellant.

*Houghton, Cluck, Coughlin & Henry,* for respondent.

SIMPSON, J.—This litigation involved the validity of a will and the alleged gift of property by Otto Gallinger to F. E. Vogleson, and was presented to the superior court in the following manner:

August 22, 1947, F. E. Vogleson filed his petition alleging that, August 21, 1947, Otto Gallinger, a resident of Seattle had died and left estate in King county; decedent left no will; his heirs were unknown. Upon the filing of the petition, an *ex parte* order was entered granting special letters of administration to Vogleson, who qualified by filing his oath and bond.

September 5, 1947, C. B. W. Raymond, attorney for Mr. Vogleson, filed a petition asking that he, Raymond, be ap-

pointed general administrator of the Gallinger estate. It was alleged in that petition, among other things, that the estate was of the value of thirty-five thousand dollars or more, and that Gallinger died intestate.

September 12, 1947, A. F. Cottin filed objections to the petition of Mr. Raymond and then presented his petition for probate of a will claimed to have been executed by decedent July 24, 1947. It was further stated in the petition that the will had been lost or destroyed, but was in existence at the time of the death of the testator. A copy of the purported will was made a part of the petition.

A few days thereafter, Cottin filed a motion for an order increasing the bond of the special administrator and restraining the special administrator from disposing of any of the assets of decedent. Citation was then issued restraining Vogleson from disposing of the assets and effects of the decedent until the further order of the court.

September 26, 1947, an order was entered reciting that a proceeding was pending for the probate of a lost will, and that it was necessary that a general administrator be appointed. The order then directed that Charles A. Spirk be appointed general administrator of the estate.

A trial was had upon the pleadings to which we have just referred. At its conclusion, the trial court entered its findings of fact and conclusions of law and a decree establishing the lost or destroyed will as that of Otto Gallinger, and a further decree to the effect that Gallinger had not made a gift of his property to Vogleson. Motion for new trial was presented and denied.

F. E. Vogleson then appealed to this court from the judgment admitting the will and denying the claim of gift. His assignments of error are:

"(1) The court erred in holding that the evidence failed to establish a gift causa mortis or a gift inter vivos by the deceased to appellant.

"(2) The court erred in admitting the purported will of the deceased to probate as a lost or destroyed will."

At the threshold, we are faced with a motion to dismiss the appeal from that part of the judgment establishing the lost or destroyed will of Mr. Gallinger. This

motion is based upon the ground that appellant had no appealable interest in the issue relative to the establishing of a will. One who has no interest in the subject matter and is not injuriously affected by a judgment, order, or decree, is not entitled to present an appeal. Rem. Rev. Stat., § 1716 [P.P.C. § 5-1]; *Cairns v. Donahey,* 59 Wash. 130, 109 Pac. 334; *In re Maher's Estate,* 195 Wash. 126, 79 P. (2d) 984, 117 A. L. R. 91; and *State ex rel. Simeon v. Superior Court,* 20 Wn. (2d) 88, 145 P. (2d) 1017.

The appellant in this case was not in any way concerned with the manner in which the estate was to be administered. The appeal, in so far as it applies to the probate of the will is concerned, will be dismissed.

Otto Gallinger was born in Saxony and studied chemistry at the University of Weimar. Many years ago, he came to Seattle, at which place he resided until his death, August 21, 1947. At one time, Gallinger operated the Acme Tire Shop. During the year 1934, he started the business of giving hair and scalp treatments. His residence and place of business was 718 Pike street, Seattle. He was a bachelor and lived alone. Ten years before his death, he contracted a disease and was treated professionally by respondent. July 24, 1947, Gallinger executed his will and named respondent executor. In the will, he bequeathed five hundred dollars each to respondent's young grandchildren. The balance of his property was given to his brothers and sisters. August 20, 1947, Dr. V. E. Bellinger, a physician and surgeon of Seattle, called on Gallinger and found him in a critical condition, but able to walk. Dr. Bellinger made arrangements for his patient to be taken to the Woodland sanitarium. The next evening, Gallinger passed away.

Respondent was a native of France, being brought up in Alsace-Lorraine during the time it was under German rule. He spoke the German language and, after he met Gallinger in Seattle during the year 1918, frequently conversed with him in that language. They knew families in common in the old country. These mutual interests caused them to

remain friends throughout the years. At times, respondent entertained Gallinger at his home, and, on some occasions, loaned him money.

Appellant stated his occupation to be that of a teacher of scientific business training and business consultant. He was registrar for the Blackstone College of Law and studied law at the LaSalle Extension University. He made out Gallinger's income tax reports for the years beginning with 1941. Appellant knew very little of Gallinger's life, or of his business affairs except as reflected in the income tax returns. Appellant testified that he had known Gallinger for fifteen years, saw him frequently, and noticed his failing physical condition for a period of two years before his death. During this latter period, he performed services for Gallinger for which he was paid. When Gallinger went to the hospital August 20, 1947, he gave the keys to his house and place of business to appellant, who immediately took charge of the premises.

Speaking of Mr. Gallinger, Dr. Bellinger testified:

"A. He talked to the old gentleman for a few moments, and realizing he had to be gotten out of there right away, Mr. Vogleson came in the hall or the front room at the same time, and Mr. Gallinger, I remember very clearly, said 'Here is the key—' [Interpolation by counsel and court] Q. At the time this conversation occurred, what was his condition as to having been prepared to go to the hospital, was he fully dressed? A. Yes, sir; he was fully dressed. Q. Now, what was said? A. He reached in his pocket and pulled out a key, and he said to Mr. Vogleson 'Here is the key to my place. I give you everything, and you take care of me, won't you.' That is as far as I can remember his exact words. . . .

"Q. Was there any conversation in your presence between Mr. Gallinger at that time and the lady who runs the sanitarium? Was there any conversation in your presence? A. Yes, sir. The lady was with me when I examined him. Q. Who is she? A. Mrs. Leitch. Q. What was said? A. After I had questioned him and examined him, Mrs. Leitch, if I remember correctly, said 'Who' is going to pay for your care?' And he said 'Mr. Vogleson will take care of everything.' Q. Did he say anything about

what he had done with his property? A. That he had given it to Mr. Vogleson."

Mrs. Leitch, in charge of the sanitarium, stated:

"Q. When Dr. Bellinger came did you have any conversation with Gallinger in Dr. Bellinger's presence? A. I went up with Dr. Bellinger. Q. Did you have any conversation with Mr. Gallinger? A. Yes, sir; I did. Q. What was that conversation? A. Naturally we have got to know where our money is coming from when a patient enters the sanitarium, and I asked him who was going to take care of his bill, and he said Mr. Vogleson, he gave him—as near as I can remember—he had given him everything he had, and he would take care of him. Q. That was in Dr. Bellinger's presence? A. Yes, sir."

Opposed to this evidence is that of James Casura and John H. Leu, the two ambulance attendants who took Gallinger to the sanitarium. In short, their testimony was: Mr. Gallinger did not want to go to the hospital and was worried about his business, because he said he was the only one who could conduct it. Appellant told the old gentleman "not to worry, because he would take care of things for him." Mr. Casura stated:

"A. The old man said he didn't want to go. He started to change his mind, and he said what would happen to his place. Q. Did the old man say anything about his friends? A. No, sir. Q. Did he discuss the sanitarium? A. He said he didn't want to go there, because it was too far for people to come and see him, and we told him where it was. Q. What did Mr. Vogleson say to the old man just before he left? A. Mr. Vogleson told him not to worry, that he would lock up the place for him and bring the key to him later."

The one question for decision is: Did the decedent, prior to his death, make a gift of all, or part, of his property to Mr. Vogleson?

After trial, the court took the matter under advisement and, on December 13, 1947, made and filed a memorandum opinion. That opinion was so well considered that we adopt it as our decision in this case. The portion that had to do with the question relative to the gift of property to Mr. Vogleson is as follows:

■ "A gift will not be presumed, but he who asserts title by this means must prove by evidence which is clear, convincing, strong and satisfactory a clear and unmistakable intention on the part of the donor to make a gift of his property, and the delivery of the property must be as perfect as the nature of the property and the circumstances and surroundings of the parties will reasonably permit. *Dingley v. Robinson,* 149 Wash. 301 [270 Pac. 1018]; *In re Slocum's Estate,* 83 Wash. 158 [145 Pac. 204]; *Newsome v. Allen,* 86 Wash. 678 [151 Pac. 111]; *Ryder v. Harris,* 187 Wash. 195, 196 [60 P. (2d) 79]; *In re McCoy's Estate,* 189 Wash. 103, 104 [63 P. (2d) 522]; *In re Hamilton's Estate,* 190 Wash. 646, 653 [70 P. (2d) 426]; *Tucker v. Brown,* 199 Wash. 320, 325 [92 P. (2d) 221]; 38 C. J. S., Title, Gifts, § 18, p. 796.

■ "In evaluating and weighing the testimony of witnesses, pro and con, relative to gifts, the trier of the facts must necessarily consider the demeanor of the witness upon the witness stand, his or her fairness or lack of fairness, the apparent candor or lack of candor of such witness, the reasonableness or unreasonableness of the story such witness relates and the interest, if any, which the witness has in the result of the trial, together with any other fact or circumstance arising from the evidence which in anywise affects the credibility of such witness.

" 'As a general rule it may be said that anything having a legitimate tendency to throw light upon the accuracy, truthfulness, and sincerity of a witness including the surrounding facts and circumstances, is proper to be shown and considered in determining the credit to be accorded his testimony, while on the other hand, it is not proper for the triers of fact to consider matters which, even if true, would not have any legitimate tendency to lessen the credibility of the witness.' 70 C. J., Witnesses, § 916, p. 760.

■ "Applying such general rule relative to the credibility and weight to be accorded to the testimony of the witnesses, I am of the opinion, after a careful consideration of the conflicting testimony and evidence herein, direct and circumstantial, that Mr. Vogleson has not established a

gift, either *inter vivos* or *causa mortis*, to him by clear, convincing, cogent or satisfactory evidence herein. On the contrary, I believe that it is established, by a fair preponderance of the evidence, that what the decedent intended to do, and actually did do, was to temporarily place the keys to his place of business and living quarters into the hands of Mr. Vogleson to keep the same while the decedent was in the sanitarium. My finding that a gift by the decedent of all or any of his property to Mr. Vogleson was neither intended nor made, is not only supported by the clear and convincing testimony of the disinterested ambulance attendants, but also by the surrounding circumstances, the general habits of the decedent and the acts of Mr. Vogleson subsequent to the time he secured decedent's keys. The evidence clearly discloses that the decedent, while untidy in his later years, had kept in rather close contact with Dr. Cottin and the latter's family for many years. Dr. Cottin and the decedent had both been born and educated in Alsace-Lorraine, Europe, and migrated to Seattle during their younger years. Educated in chemistry, decedent followed, at least during the later years of his life, the business of compounding of chemical formulas and making practical application thereof. Dr. Cottin became a drugless physician. There existed between the two a close friendly relationship because of racial ties, boyhood and life associations and a mutual interest in chemistry and allied sciences. The decedent, while suffering for years with dropsy or nephritis (Bright's disease), continued to take care of his business until the 20th of August, 1947. On July 24, 1947, he executed the will here in question. On August 21st Mr. Vogleson visited the decedent's place of business and found decedent in a serious condition. The former called his personal physician who, after examination, advised that decedent be taken to a sanitarium to which he frequently sent patients. The decedent, at the time, was averse to going to the hospital and never expressed any belief in his imminent death nor explained to Mr. Vogleson or the physician the nature, extent or whereabouts of his property or his relatives or his close friends.

It is contended by and on behalf of Mr. Vogleson that, during the conversation on this afternoon between the decedent, Vogleson and the latter's physician, the decedent orally gave all his property to Mr. Vogleson and delivered to him the keys to his place of business and living quarters. The two ambulance drivers, who were present during a portion, if not all, of such conversation, testified in effect that decedent merely gave his keys to Vogleson and asked him to look after the place while decedent was in the sanitarium. The following is significant:

"(1) That while it is contended that Mr. Vogleson was an intimate or best friend of the decedent, it appears that the main, if not the sole, purpose of their association was in the occasional preparation of income tax returns for the decedent and negotiations at one time with Mr. Diller concerning the occupation by decedent of his abode and place of business. There is no evidence that decedent ever discussed with Mr. Vogleson his past history, his kith and kin, the decedent's friends or the extent or nature of the latter's property;

"(2) That the acts of Mr. Vogleson, subsequent to the transaction here in question, are inconsistent with a claim of gift to him by the decedent of all of the latter's property. Such acts are:  (a) The filing of a verified petition for special letters of administration; (b) failure to make disclosure in such petition of his claim of gift; (c) removing and destroying articles of decedent without order of court; (d) failure to file a verified report as special administrator; (e) failure to call on decedent at the sanitarium; and (f) failure to secure a court order authorizing disposition of decedent's remains;

"(3) That while the evidence discloses that the decedent in his later years at least was an untidy housekeeper and careless as to his personal appearance, it clearly appears that he was methodical and careful in the preservation of his documents, papers, securities and effects;

"(4) That the meager, belatedly produced sanitarium records fail to disclose any report of laboratory tests or the administration of any remedies other than heart stim-

ulants and sedatives. Such record does disclose that decedent entered the sanitarium in the evening of August 20th and that he expired in the evening of the following day. Such record does not disclose that any inquiry as to decedent's relatives was made upon his admission to the sanitarium.

■ "Since the estate of the decedent apparently consists of stocks and securities of the approximate value of $42,000.00, which were at the time and now are capable of manual delivery, the evidence is insufficient to establish a gift thereof to Mr. Vogleson for an additional reason.

"It is stated in the note to *Braun v. Brown* (Calif.) [14 Cal. (2d) 346, 94 P. (2d) 348], 127 A. L. R. 773, 780:

" 'It is a generally accepted rule that gifts inter vivos and causa mortis must be fully executed—that is, there must be an intention to transfer title to the property, a delivery by the donor, and an acceptance by the donee. In respect of delivery, it is generally held that an actual delivery is necessary for the consummation of a gift of either class when the subject of the gift is capable of manual delivery, but that where an actual manual delivery cannot be made, the donor may do that which, under the circumstances, will in reason be considered equivalent to an actual delivery. In other words, in such cases the delivery may be symbolical or constructive, although it must always be as nearly perfect and complete as the nature of the property and the attendant circumstances and conditions will permit. 24 Am. Jur., Gifts, p. 741, § 22, p. 744, §§ 26, 27.'

"The Washington cases follow this general rule. While it is stated in the case of *In re White's Estate*, 129 Wash. 544 [225 Pac. 415], that the strictness of the old rule of law relative to manual delivery 'has been softened so that only such delivery is required as the nature of the thing given and the circumstances under which it is given will permit,' the case at bar does not involve the delivery of a key to a safety deposit box, but the delivery of a key to a place of business and abode, occupied by the decedent, at a time when he and Mr. Vogleson were therein and the securities in question were in such place, capable of being manually delivered.

"The case of *Dingley v. Robinson,* 149 Wash. 301 [270 Pac. 1018], is, in my opinion, peculiarly applicable to the case at bar. Syllabus 1 of the decision of the Supreme Court in such cited case is as follows:

" '(1) GIFTS (8)—EVIDENCE—SUFFICIENCY. A gift, from mother to son, of bonds and stocks in a safety deposit box is not shown by clear and satisfactory evidence when supported only by the testimony of the son's wife that, on the eve of an operation, his mother said to him in the presence of the witness, 'all of the property is in the deposit box in your name, you have the key and it is yours;" there being other evidence that decedent recorded all other gifts in a diary, and that the son had always had a key to the box and only used it to make interest collections for his mother.'

"See also: *Newsome v. Allen,* 86 Wash. 678 [151 Pac. 111]. The latter cited case is mentioned as supporting the general rule in the above mentioned note in 127 A. L. R. 773, 793, in which it is said:

" 'There appears to be some difference of opinion as to whether delivery of the key is sufficient where the subject of the gift is so situated and of such a character as to be susceptible of manual delivery. The majority of the cases in which this point has been discussed have held or intimated that delivery of the key is not sufficient under such circumstances.'

"The cases of *Mackenzie v. Steeves,* 98 Wash. 17 [167 Pac. 50], and *Velikange v. Dickman,* 98 Wash. 584 [168 Pac. 465], cited by counsel for Mr. Vogleson, do not hold contrary to my conclusion as to the alleged gift here in question.

"It may be noted that the same general rules apply to both gifts *inter vivos* and gifts *causa mortis,* the main distinction between such gifts being that gifts *causa mortis* do not become effective until the death of the donor, while an unconditional gift *inter vivos* is consummated by a delivery of the property."

The judgment of the trial court is affirmed.

MALLERY, C. J., ROBINSON, SCHWELLENBACH, and HILL, JJ., concur.