[No. 30112. Department One. April 24, 1947.]

JAMES KAUSKY, *Appellant*, v. GRACE KOSTEN, *Respondent*.[1]

[1] Reported in 179 P. (2d) 950.

*John J. Kennett* and *Fred C. Campbell,* for appellant.

*Riddell, Riddell & Hemphill,* for respondent.

ABEL, J.—This action was brought by plaintiff to cancel a deed to certain property in Seattle given by plaintiff to defendant, without consideration, in 1929, for possession of the premises, and to recover the value of their use. Defendant answered, claiming the property was deeded to her as a gift. The trial was to the court, which dismissed the case and made the following finding:

"As a part of, and to further his campaign in attempting to induce the defendant to marry him, the plaintiff executed and delivered said deed to the defendant as a voluntary gift. . . . [He] agreed with her to manage and care for the said premises: no compensation mentioned."

At the time of the trial, plaintiff was a man sixty-six years of age, who had been married to Louise A. Kausky. They had lived on these premises and had one son. They were divorced in March, 1923. The custody of the child was awarded to the wife, with a provision that plaintiff pay thirty dollars per month for the support of the child. Shortly after the interlocutory decree was entered, his wife delivered the child to plaintiff. He at that time was working as a bookkeeper in a Seattle bank, earning one hundred eighty dollars a month. He was attempting to develop a chicken ranch, and had a hired man who tried to keep an eye on the child during the day while plaintiff was working.

Plaintiff was a man of very little education. He worked at the Bremerton navy yard as a laborer and worked as a motorman in Seattle prior to 1909. He attended a business college, brushing up on bookkeeping, and in 1909 went to

work as a bookkeeper for the Seattle National Bank, where he worked twenty-three years in the same capacity. The highest salary he ever earned at the bank was one hundred eighty dollars a month, and during the depression years his salary was one hundred twenty-five dollars a month.

Defendant testified at the trial that she was fifty-four years of age. She had a grade school and high school education, and two years at Hunter college. She went overseas with the YMCA in the First World War, serving as an entertainer. She was first married to George Kosten·in 1912. In 1919, she separated from him, ceased to be a housewife, and commenced to earn her own livelihood. She divorced Kosten in King county in 1925.

In 1919, she went to China as a social secretary and office helper for an importer. She testified that she had no financial resources when she separated from Mr. Kosten in 1919. She stayed in China approximately two years, being employed only about one year of that time. Upon her return to the United States in 1922, she took employment as superintendent of a women's hostelry in New York. She had such employment for approximately a year at a salary of one hundred twenty-five dollars per month.

In 1923, she went to California as assistant superintendent of an orphanage, where she was employed for six or seven months at a salary of one hundred twenty-five dollars per month. She left this employment and took a trip to Alaska, stopping over in Seattle, at which time she met plaintiff. She was going to Alaska for a change of climate, thinking that it would better her health. She was not going to Alaska to seek employment. While in Seattle, she lived at the Ethelton hotel and saw plaintiff many times.

Plaintiff took her out to dinner, to shows, and for automobile rides, and proposed marriage during this period before she went to Alaska. She had no employment while in Seattle but lived off her savings.

She went to Alaska in late 1923 and stayed there for approximately three months; she had no employment, but was living off her savings. She returned to Seattle and

remained two or three months, during which time she had no employment, living at the Moore hotel. She returned to Alaska and worked in a newspaper office for a while, staying there three or four months. While in Alaska, she corresponded with plaintiff. She returned to Seattle and worked as a proofreader for the Seattle PI for a time. Her pay in Alaska in newspaper work and in Seattle was forty-five dollars a week. After giving up her employment with the Seattle PI, she had no employment. However, she lived at the Wilhard hotel or at the Ambassador hotel until 1926, when she went to China.

Plaintiff called on her at the Wilhard hotel and took her to lunch and dinner and shows and on automobile rides. She testified that she had both male and female friends other than plaintiff, and that none of these friends gave her money or loaned her money or paid her room rent.

She went to China in 1926 and remained there until 1928, when she returned to New York by way of Europe. When she got to New York, she married. She was gone on this last trip at least two years, and during that period she testified that she had no employment at all.

Her marriage in October, 1928, was to a Mr. Bowman, with whom she cohabited less than a month. Their marriage was annuled at the instance of Mr. Bowman in the summer of 1929.

Following her separation from Bowman, she came to Seattle in January, 1929, remaining there only a few days. While in Seattle, she saw plaintiff. She then returned to New York. She was not employed during the fall of 1928 and the spring of 1929 while married to Mr. Bowman. The annulment of the marriage to Mr. Bowman occurred in July or August, 1929, and about October 15, 1929, she returned to Seattle. She obtained the deed to the property in question from plaintiff on October 24, 1929, about nine days after her return to Seattle.

Defendant testified that, before she left the East this last time, she planned to go to the Orient. She did not tell plaintiff of this contemplated trip until some time after the

deed was given to her. She left in January, 1930, remaining in the Orient until 1941.

During the period of their acquaintance, plaintiff proposed marriage to defendant on numerous occasions. He gave her many gifts and generally saw her several times a week while she was in Seattle. They went on many automobile rides, to shows, and he took her out to dinner on numerous occasions. Their relationship was always proper.

Defendant never rejected the plaintiff, although she apparently never consented to marriage. Undoubtedly, she led plaintiff to believe that she would marry him.

At different times there was discussion between these people as to whether or not plaintiff should put the title to the real estate involved in this case in the name of defendant, plaintiff claiming, although this is denied by defendant, that the discussion was as to whether his former wife would have a claim against this property by reason of the fact that plaintiff had not paid her support money for the support of the child.

While defendant was in the East in the year 1929, and just before the deed was given, she wrote to plaintiff as follows:

"But if you feel so inclined, when I come West, I am going to let you put the house in my name as you wanted to do about three years ago."

When questioned regarding the above letter, defendant testified that plaintiff had offered to give her the house more than a dozen times. Her explanation as to the use of the words, "let you put the house in my name as you wanted to do about three years ago," was that it was "just terminology."

Plaintiff testified on this point as follows:

"Q. Did you ever discuss with the defendant your status with reference to support money for your child? A. Yes, I did. . . . Q. What was it? A. The boy was with me and I wasn't paying any money to the wife for his support. And I said that she may come back on me for that support money. Q. You said that in a discussion with Mrs. Kosten? A. Yes. Q. And what did she say? A. I don't know whether it was at that time or not, but she says: 'You better put that

in my name and whenever you want it, you can have the property back again.' . . . Q. Can you tell us how long that was before you actually made this deed which is in evidence? A. According to the letters here and so on, it must have been about three years when I first discussed it with her."

Plaintiff testified regarding the conversation at the time the deed was given, as follows:

"Q. And what was the conversation between you and her at the time you executed the deed in question? A. It was the same thing. I was thinking the wife might come back for the back payments; and she suggested that I turn it over to her and that she would give it back to me whenever I wanted it. And at the same time she made the remark that the deed wasn't worth the paper it was written on."

After the deed was given, plaintiff continued to manage the property until July 17, 1941. He collected the rent, he paid all the taxes on the property, he paid over fifteen hundred dollars on the mortgage debt, he painted the house, he leased the house in his own name.

In November, 1930, plaintiff wrote to defendant in part as follows:

"Now, if when you are ready to come back and I haven't any money from the will yet, if you will have that deed made to my name so I can borrow enough to send to you so you can get back to the States."

Apparently, plaintiff never thought that defendant would remain in the Orient as long as she did, and, in the year 1933, he started going with another woman, and in August, 1933, he wrote to defendant in part as follows:

"I am about 4 payments behind to the Wash. Mutual Bank. And I was wondering if you would give me title to it, as the government is going to make loans to people who are about to loose their homes. If I had title to it, I could do things better. Then this young lady that I am going with. thinks that it is mine, and if she finds out otherwise it may cause trouble. As things are now, I am not able to make payments and pay taxes. I think you will understand."

Again in October, 1933, plaintiff wrote to defendant as follows:

"If I had a deed to it, I could get a loan from the government (Mortgage Loan Assn.) in case the Washington Mutual Bank wants to foreclose on me, which they might, if I don't keep up the payments. Haven't paid the taxes yet either. Am wondering if I will hear from the last letter I wrote to you asking for the deed to the bungalow, as I am contemplating marriage and this widow lived near by when we lived there and she knows that I am handling it, thinking that I still own it. And it may break our engagement if she finds out that I have not the deed to it."

Defendant wrote plaintiff in reply to this letter as follows:

"Your letter of October 15th has just been forwarded to me from the consulate. Needless to say, I am very surprised at its contents, and shall not at this time attempt to answer it."

When defendant was cross-examined as to what she meant by the above quotation, she stated:

"I didn't want to put down things that I might regret afterwards, or say something I shouldn't. I just went by the board and waited. I bided my time."

The testimony clearly shows that plaintiff is a gullible, foolish old man. Defendant's testimony stamps her as an adventuress of world-wide experience, a woman who was out to get what she could. She was "on the make." We have no doubt that she strung plaintiff along with every guile she possessed, and she induced him by various types of suggestions or reasoning to place his home in her name.

We believe that the evidence establishes a trust under which respondent was to reconvey the property to him. Whether or not parol evidence is admissible to establish such a trust, depends upon the nature of the trust in question; that is, whether it is an express trust, a constructive trust, or a resulting trust. The rule adopted by this court is that constructive and resulting trusts may be established by evidence of oral agreements, but that express trusts cannot be so proved.

Constructive trusts are defined in 4 Pomeroy's Equity Jurisprudence (5th ed.) 119, as follows:

"Trusts ex Maleficio.—In general, whenever the legal title to property, real or personal, has been obtained through

actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein; and a court of equity has jurisdiction to reach the property either in the hands of the original wrong-doer, or in the hands of any subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right, and takes the property relieved from the trust."

The methods of creating a constructive trust are stated in 1 Pomeroy's Equity Jurisprudence (5th ed.) 210, as follows:

"*Constructive trusts* are raised by equity for the purpose of working out right and justice, where there was no intention of the party to create such a relation, and often directly contrary to the intention of the one holding the legal title. All instances of constructive trust may be referred to what equity denominates fraud, either actual or constructive, including acts or omissions in violation of fiduciary obligations. If one party obtains the legal title to property, not only by fraud or by violation of confidence or of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner (see §§ 1044 *et seq.*). Courts of equity, by thus extending the fundamental principle of trusts—that is, the principle of a division between the legal estate in one and the equitable estate in another—to cases of actual or constructive fraud and breaches of good faith, are enabled to wield a remedial power of tremendous efficacy in protecting the rights of property."

*Rozell v. Vansyckle,* 11 Wash. 79, 39 Pac. 270, was a case where plaintiff anticipated that a lawsuit might be brought against him, and wished to protect his land from attach-

ment or execution. He confided in defendant and sought his advice. Defendant advised plaintiff to deed the land to him on his oral promise that he would hold the premises in trust and would reconvey to plaintiff upon his request. The transfer was made, and thereafter defendant mortgaged the lands for one thousand dollars and subsequently conveyed to one Gardiner. The defense of the action was that it was a verbal agreement and therefore fell within the statute of frauds. This court canceled the deed from plaintiff to defendant and from defendant to Gardiner, using the following language:

"The parol promise upon the part of Vansyckle, and upon which the plaintiff relied, was made in bad faith and with intent to deceive, and hence amounted to an actual fraud. It was made by him without any intention of performing it; and the construction which the statute of frauds has almost universally received is that it excepts from its operation trusts which arise from fraud, either actual or constructive. This we conceive to be the principle upon which the rule laid down by Pomeroy, Story and the other writers on the subject, rests. . . .

"It would, in our opinion, be a reproach upon the law if a person should be permitted to profit by a transaction effected in the manner that this one was. A confidence was reposed by respondent which was grossly abused by Vansyckle. Taking advantage of this confidence in him, and of the reliance that respondent had in his superior business sagacity; taking advantage, also, of the ignorance and weak intellect of the respondent, and of his excitement, apprehension and alarm (whether unfounded or not does not matter) growing out of his relations with Conrad, and assuring him of his friendship and desire to assist in what he encouraged the respondent to believe was an entirely innocent transaction, Vansyckle secured from respondent a conveyance of eighty acres of valuable land, without any consideration paid or promised, upon which he thereafter secured a loan of $1,000 for his sole use; and subsequently conveyed the premises to appellant Gardiner (his son-in-law), who took the conveyance with full knowledge of all the circumstances, assurances and promises attending the transfer from respondent to Vansyckle. The rule of law that denies relief to suitors who are *in pari delicto* is not violated by restoring to this respondent the premises in

question, and defendants, upon the record here produced, cannot be permitted to invoke that rule to shield them from the consequences of a fraud in the consummation of which they were the principal actors and the sole gainers."

In *Johnson v. Johnson,* 122 Wash. 117, 210 Pac. 382, the parties were husband and wife. In 1915, Mr. Johnson executed deeds conveying all of his property to his wife. His wife urged him to do this, stating to him that she would hold the property so that both would have the benefit of it insofar as their living necessities would require, and that she would reconvey it to him at any time that he might desire her to do so. Prior to the execution and delivery of the deeds, and without Mr. Johnson's knowledge, Mrs. Johnson had entered into a love affair with another man. The wife's defense to the suit to set aside the deeds was the same as here—that is, that it was an oral agreement and hence fell within the statute of frauds. This court ruled that the wife held the property merely under a constructive trust, and that her husband was entitled to have it restored to him. We stated on p. 122 as follows:

"Whether we regard the conveyance as having been made by Mr. Johnson in pursuance of an oral agreement with his wife that she would hold the property in trust for him as his separate property or in trust for the community, she then having a present intention to claim absolute ownership thereof; or whether we regard the conveyance as a gift in consideration of the marital love and affection he bore her and the marital love and affection he then believed she bore him; the facts we have above summarized we think argue all but conclusively that he is entitled to now be restored to the ownership of the property as it existed at the time of the making of the conveyance in January, 1915. If she took the property by that conveyance in pursuance of a promise by her to hold it either for him or for the community, then intending to violate that promise, and did violate it, as we think the evidence shows, she committed a fraud entitling him to the relief he seeks. If the conveyance was a gift, as she claims, in which event it was manifestly made in consideration of the mutual marital love and affection which he then believed existed between them, she then having the intention to abandon him and sever their mar-

riage relations, she committed even a more grievous fraud, entitling him to the relief he now seeks."

In *Kritzer v. Moffat,* 136 Wash. 410, 240 Pac. 355, 44 A. L. R. 681, this court held that an oral promise by the purchaser at a mortgage foreclosure sale to extend the time for redemption, made in bad faith with intent to deceive, and without intent to keep the promise, was actionable and entitled the person deceived thereby to recover for his loss. We stated, on p. 419, "The real fraud is the expressed or implied false representation of his intention to pay."

In *Rennebohm v. Rennebohm,* 153 Wash. 102, 279 Pac. 402, the action was one to set aside certain deeds alleged to have been fraudulently obtained by virtue of a promise to certain heirs, that if they would forego their right of inheritance, the promisor would make a home for them and would leave the property to them by his will. In that case, it was urged that the contracts could not be enforced because of the statute of frauds. We stated, on p. 107:

"Fraud vitiates every contract in which it is a procuring factor, and if it can be established by proof that the deeds were procured by fraud as alleged, we need look no further or inquire as to whether the consideration, had there been no fraud, could have been enforced."

In the case of *Murdoch v. Leonard,* 1 Wn. (2d) 37, 95 P. (2d) 37, the controversy was between mother-in-law and son-in-law, who obtained the title to the mother-in-law's property by means of fraudulent representations and concealments. The mother-in-law remained in possession of the property after the giving of the deed, until her daughter and son-in-law had trouble that resulted in divorce. Then, the son-in-law began to assert his right to possession, and brought an action to quiet his title as against the mother-in-law and for possession of the premises. This court held that the son-in-law, by false representations as to the amount of existing materialmen's liens, induced the mother-in-law to permit the property to be foreclosed, and later induced her to execute a deed to him upon the representa-

tion that, if he were permitted to take title, she could remain in possession during her lifetime. We stated, on p. 39:

"We believe from the evidence that the latter representation was made with no intent, at the time it was made, to abide by it. Being false, it constituted fraud. *Kritzer v. Moffat,* 136 Wash. 410, 240 Pac. 355, 44 A. L. R. 681; *Rennebohm v. Rennebohm,* 153 Wash. 102, 279 Pac. 402. That the former representation was false, is not disputed. The respondent was entitled to, and did, rely upon the representations to her damage.

"Appellant urges that respondent alleged and attempted to prove an express trust; that, since an express trust may not be established by parol evidence, her cause must fail. What theory was advanced at the trial by way of argument in support of her cause of action, is not apparent from the record. It is clear from the record, however, that respondent alleged and proved that appellant obtained title by fraudulent representations and concealment. Upon title so obtained, equity imposes a constructive trust which may be established by parol. *Rozell v. Vansyckle,* 11 Wash. 79, 39 Pac. 270; *Rennebohm v. Rennebohm, supra.*"

█ It is apparent that in the event the respondent obtained the deed in question from appellant by false and fraudulent promises which she then did not intend to keep, and we so find, then she held the deed under a constructive trust, and should be required to deed the property back to appellant.

As stated by Pomeroy, a constructive trust can be created where the legal title to property is obtained

". . . not only by fraud or by violation of confidence or of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another."

Therefore, in the event there is a violation or a confidential or fiduciary relation, which amounts to fraud, the respondent should be held to hold the property under a constructive trust.

In *Higgins v. Chicago Title & Trust Co.,* 312 Ill. 11, 143 N. E. 482, the court states:

"A fiduciary relation, however, is not limited to cases of trustee and cestui que trust, guardian and ward, attorney

and client, or other recognized legal relations, but it exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The origin of the confidence is immaterial. It may be moral, social, domestic, or merely personal. If the confidence in fact exists, is reposed by the one party and accepted by the other, the relation is fiduciary, and equity will regard dealings between the parties according to the rules which apply to such relation."

In the case of *Tucker v. Brown,* 199 Wash. 320, 92 P. (2d) 221, where the relation was that of close friend and financial adviser, we stated, on p. 331:

"In the case now before us, it seems clear that a fiduciary relationship existed between Mrs. Smith and Mr. Brown. Such a relationship is said to exist 'where confidence is reposed on one side and resulting superiority and influence on the other.' *Rubin v. Midlinsky,* 321 Ill. 436, 152 N. E. 217. There can be no question but that Mrs. Smith reposed complete and absolute confidence in Mr. Brown, which resulted in his influencing or controlling all of her actions. His was the superior intelligence and the dominating influence. It is true that Mrs. Smith was in some respects a very shrewd and capable woman; in others, she was credulous and easily influenced. It is difficult to believe that Mrs. Smith would have turned over all of her property to Mr. Brown, as she did, without there being a fiduciary relationship between them."

In the case at bar, it is apparent that respondent was the dominating character. Appellant was deeply in love with her, and she led him to believe that she was going to marry him. She led him to believe that the best thing to do was to place the property in her name. She did not write to him that she would let him give her the property; she wrote to him that she would "let him put the property in her name." There was no consideration. A confidential relationship existed between these parties, and a court of equity can and should step in to prevent respondent from completing her fraud.

The lower court found that respondent had paid taxes, assessments, and payments on the mortgage since 1938 in the sum of $579.18, and that the reasonable rental of the

property in question during the time respondent was in possession was the sum of twenty-five dollars per month. We agree with this finding.

This cause is reversed, with directions that a decree be entered quieting title in appellant to the real estate described in the decree, that respondent be required to pay appellant rental for the time she has had possession of the property in the sum of twenty-five dollars per month, and that she be given credit for the amount of taxes, assessments, and payments on the mortgage, in the sum of $579.18. Since the interest on the amount respondent owes would approximately offset the interest on the amount she would have coming, there will be no interest allowed on either of these items.

MALLERY, C. J., MILLARD, and SIMPSON, JJ., concur.

SCHWELLENBACH, J. (dissenting)—If we are going to protect gullible, foolish old men from women of the world who are "on the make," it seems to me that this result could better be accomplished by leaving these gullible, foolish old men just where their foolishness placed them. Men will continue to be gullible and give their property away, if they can come before a tenderhearted court and have these foolish transactions set aside.

I hold no brief for this woman. Perhaps she was "on the make." But I fail to find in the record any fiduciary relation between the parties, or any undue influence or taking advantage of his weakness by her. The parties met in 1923, just after appellant had been divorced from his first wife. He knew that Mrs. Kosten was still married. Nevertheless, he took her out to dinner, to shows, and for automobile rides, and proposed marriage to her. Whenever she was away, they corresponded. When she happened to be in Seattle, they would go out together, and he would present her with gifts. He wanted to marry her, but she didn't say yes, she didn't say no. Their relationship was always proper.

Appellant claims that he deeded this property to respondent because he was behind in payments due his former

wife for support of their boy, and that respondent prevailed upon him to place the property in her name with the understanding that he could have it back whenever he wanted it. It is amazing that a man can come into a court of equity and ask for the return of property which he claims he transferred out of his name for the purpose of defeating a just obligation imposed upon him by another court of this state. But the facts do not square up with this contention. At the time in question, he had a ranch in Renton, which he retained. The property involved herein was not deeded to respondent for the purpose of defeating any right of his former wife in collecting support money. Furthermore, the fact that this designing woman only received part of his property does not speak very well for the influence which she exerted over him, nor does it indicate to any great extent his weakness.

The transfer of the property involved arose in this manner. In 1925, Mrs. Kosten divorced her husband. In October, 1928, after being absent from Seattle since 1926, she went to New York and married a man called Bowman. He left her in a month and started an annulment suit. She and Kausky had always corresponded. She wrote him from New York that she had lost the annulment suit, and that the cost of appeal would be prohibitive. He wrote her on June 22, 1929:

"Gee, I wonder if I couldn't help you, I would be willing to sell my place in town and get what I could for it. If you can put them off until you come out West and we will try to fix things up."

She replied on July 5, 1929:

"Saw my lawyer on Tuesday morning and learn that the attorney's fee without the cost of the high court (Appellate Division) would be over a thousand dollars, the court additional. He told me to consult another attorney as to costs, etc. But I think it is entirely out of the question. Thanks so much, friend-o-mine, for the kind offer: no, I wouldn't even dream of allowing you to make such a sacrifice. But if you still feel so inclined, when I come West, I am going to let you put the house in my name as you wanted to do about three years ago. I remember your saying there

would be quite some for Jimmy with the ranch and your insurance. I know you will understand what it means to me writing you this way. You have always been such a dear friend."

She did not come to Seattle until October. The deed was executed October 24, 1929. He testified that she suggested that he turn it over to her, and that she would give it back to him whenever he wanted it. The trial judge questioned him as follows:

"Q. And I wish you would tell me the circumstances under which you gave this deed. Now, let me make clear to you before you answer. You didn't meet this woman in front of that bank and hand her a deed and she said 'Thank you.' That is all? A. No. Q. That doesn't happen. You met her somewhere, talked to her, went to the bank, talked to the people in the bank, and the net result was, as you have told us, that she went one way with the deed and you went the other way probably back to your work? A. Yes. Q. Now, tell me about what happened on that day? A. Well, we talked about it before, if I remember right. We were walking along Fifth Avenue,—Oh, I think Seneca Street, when she asked me and I said, yes I would fix it up. Q. What did she ask you? A. She wanted to know if I would put it in her name, so the wife couldn't get any of it; and I don't know whether it was that day or the next day we went to the Washington Mutual. Q. Well, did nothing happen at the Washington Mutual? Did you speak to any man you knew? or what? A. No. Q. Tell me now, to the best of your memory. A. We went to the teller there and I says, 'I would like to have this transferred to Mrs. Kosten.' I didn't say why or anything; and he made out the papers and that is all there is to it. She came out and I says, 'Here, you better record this,' and I gave her 75 cents. That is all there was to it."

She left for China on January 10 or 11, 1930. On January 12, 1930, he wrote to her, enclosing the 1929 tax receipt. When she received it she wrote on February 27, 1930:

"When I went down to the American Consulate yesterday your two nice letters were there to greet me, along with . . . the tax bill of 1929 from the County Treasurer's office in Seattle on the nice little bungalow you made me a present of. You haven't any idea, old friend, when one is so far from home, especially in this heathen land, what a

wonderful feeling it is to know that on the other side of the Pacific I have a little haven all my own. Do you want me to return this tax bill to you? or have you already paid it? It is a 1929."

He replied, April 4, 1930: "I am glad that you are happy when you think of your little house here."

In 1930, he was in litigation with a brother in the East concerning his mother's will. He wrote her November 11, 1930:

"Now if brother would have been like (he) should, I would have my share by now, maybe. Then I could send my little sweetheart fare to come back on. I would do anything in the world for you, especially if you would consent to marry me. Now, if when you are ready to come back and I haven't any money from the will yet, if you will have that deed made to my name so I can borrow enough to send to you so you can get back to the States."

Then in 1933 he met the "little widow." He wrote on February 15, 1933:

"It's been about three weeks ago since I saw a movie. I took a little widow that lives close to the little bungalow. She seemed to enjoy it very much and so did I. We may be going to one soon again."

Again he wrote on May 11, 1933:

"Yes, I get pretty lonesome out here and see quite a bit of the little widow. Don't be surprised if I send you an announcement. (ha ha). Yes, the taxes on the bungalow are all paid up to this year."

Again on August 12, 1933:

"I am about 4 payment behind to the Washington Mutual Bank. And I was wondering if you would give me title to it, as the government is going to make loans to people who are about to *loose* their homes. If I had title to it, I could do things better. Then this young lady that I am going with thinks that it is mine, and if she finds out otherwise it may cause trouble. As things are now, I am not able to make payments and pay taxes. I think you will understand."

And again on October 15th:

"Am wondering if I will hear from the last letter I wrote to you asking for the deed to the bungalow, as I am con-

templating marriage and this widow lived nearby when we lived there and she knows that I am handling it; thinking that I still own it. And it may break our engagement if she finds out that I have not the deed to it."

There is nothing in the conduct of respondent which would indicate that this property was being held by her in trust. There is nothing in the conduct of appellant which would indicate such an arrangement. As far as he was concerned, the property was hers. When he wrote her on November 11, 1930, he stated that if he had the money he would send it to her for transportation back home, and only suggested she send the deed back in the event he didn't have sufficient funds when she was ready to return. But when he met the "little widow," he wanted it back. If respondent had returned the title to him, he most likely would have deeded it to the "little widow," and she would be before us defending an action by this gullible, foolish old man, instead of respondent.

I fail to find any clear, cogent, and convincing testimony in the record of any fraud or overreaching. This gullible man, in the hope that respondent would marry him, gave her a deed to this property. It was foolish of him to do so. But just because we may not approve of the transaction, that fact does not give us the right to make a new transaction for them.

The trial court said:

"It is said here that this woman through certain letters allowed or permitted this title to go into her name, and that it was a subterfuge to prevent his former wife, in the event that she sought to collect the unpaid separate (support) money installments; in the event that she undertook to enforce the decree. . . . I doubt if that is this case. I think that is an afterthought. If it were true, the plaintiff must fail here, of course."

I believe that the judgment should be affirmed.

---

June 13, 1947. Petition for rehearing denied.