[No. 42074.    En Banc.    December 16, 1971.]

PETER SCYMANSKI et al., *Respondents and Cross-appellants*, v. CONRAD DUFAULT et al., *Defendants*, WASHINGTON STATE HOP PRODUCERS, INC., *Appellant*.

*Elwood Hutcheson,* for appellant.

*Ted Roy* (of *Hovis, Cockrill & Roy*), for respondents and cross-appellants.

SHARP, J.—This case involves the tort of interference with business relations and the remedies which are available for that tort. For a proper understanding of the issues, the facts are presented at length.

In 1965, the United States Department of Agriculture issued a United States Hop Marketing Order which restricts the salable quantity of hops. Under this order, hops cannot be lawfully marketed unless covered by hop allotment base certificate rights (hereinafter called base), which vary according to a grower's production history. These base rights are transferable.

Some of these base rights were held by defendant, Conrad Dufault, a hop farmer. Conrad Dufault was a member of the Washington State Hop Producers, Inc. (appellant—hereinafter called co-op). In late 1966, he executed a marketing agreement with the co-op which obligated him to deliver all hops produced by him to the co-op for marketing. In signing, he became a member of the co-op and bound by its regulations. This agreement was to expire in 1972. The membership marketing agreement signed by Dufault contained the following:

20. During the life of the Agreement, the Grower agrees that he will not sell or otherwise transfer the lands or the possession thereof upon which hops are planted except to another member of the Association, until thirty days after he has offered the lands to the Association as agent for its members at the same price and upon the same terms as he is willing to sell or transfer to anyone else; or contract to transfer the land to such purchaser.

The bylaws of the co-op contained the following provision:

Section 30. HOP ALLOTMENT AND HOP RANCH SALES, LEASES: Notwithstanding compliance with paragraph 20

of the Membership Marketing Agreement with this Association, no member of this Association shall have the right to lease his hop ranch or any portion thereof to a non-member of the Association, or to sell, assign or transfer to a non-member of the Association, any of his hop allotment rights under the Federal Hop Marketing Order, without the written consent of the Association approved by its Board of Directors, except on the basis and subject to the express condition that all hop crops produced and harvested thereon during the remainder of the term of such Membership Marketing Agreement shall be delivered to this Association for marketing under said agreement, together with all hop allotment certificate rights of such member during said period, and in such event such member shall be personally responsible for such crop delivery, and the Association shall be entitled to the full unrestricted use during such period of all hop allotment certificates belonging to such member. (Adopted January 16, 1967.)

The effect of these provisions is to require an owner desiring to sell or transfer his hop land to offer the lands to the co-op, as agent of its members, for 30 days before transferring to an outsider; and to obtain written permission from the co-op before selling or transferring any base rights, *except* where the sale is conditioned upon the purchaser continuing to deliver the hops produced to the co-op for the remainder of the membership term.

Conrad Dufault considered withdrawing from hop farming and on September 5, 1968, gave the co-op notice of his intent to sell his 138,073 pounds of allotment base. He requested a price of 35 cents per pound cash, or 40 cents per pound on a time basis. This offer was communicated to other members of the co-op, but no member indicated a desire to buy the base offered. Leon Dufault, Conrad's brother and also vice president and a director of the co-op, agreed to purchase 18,940 pounds of the base at 35 cents per pound for his individual use if the remainder could be sold.

Peter Scymanski, plaintiff/respondent, was also a hop farmer in the area, but did not belong to the co-op. Scymanski negotiated with Conrad Dufault and it was finally

agreed that he would purchase the remaining base on the following terms: Scymanski would pay 35 cents per pound for the base and would lease from Dufault 43 acres of hop land for a 2-year period, namely 1969 and 1970. As rental, Scymanski was to pay the taxes, water, and remove the hopyard at the end of the term.

To formalize this agreement, Scymanski and Conrad Dufault met with Conrad Dufault's attorney on October 15, 1968. Leon Dufault was also present during this meeting. At this time, both Conrad and Scymanski signed and delivered their hop allotment certificates to the attorney, and Scymanski signed and delivered his check for the purchase price to the attorney to hold until the transaction was completed. The lease of the land was to be prepared by the attorney and signed when finished. It was recognized at this meeting that, by virtue of Dufault's membership, the co-op had certain rights which this agreement had to take into account and which should be looked into. Other than investigating the rights of the co-op, the parties concluded at this meeting that the sale was made.

Just prior to this meeting, Conrad Dufault had called the co-op manager, Jack Rutherford, and inquired as to the procedure for selling base to a nonmember. Dufault was informed that written permission was required from the co-op before such a sale could take place. On the day after the meeting, Conrad Dufault received a letter from Jack Rutherford, stating:

Mr. Conrad Dufault
Route 1
Prosser, Washington

Dear Conrad:

In discussing the selling of Allotment Base with members, I have become concerned that there may be a misunderstanding of the procedure involved.

In addition to advertising the Allotment for 30 days to the membership, written permission from the Board of Directors is also necessary before the Allotment is sold to anyone outside of Washington State Hop Producers, Inc. If you have any question and would like to discuss this

matter with me, please feel free to call or visit the office.
Yours sincerely,
WASHINGTON STATE HOP
PRODUCERS, INC.
Jack Rutherford, Manager

On October 23, 1968, the Board of Directors of the co-op (including Leon Dufault) met. During that meeting the requests of four members, including Conrad Dufault, for release and permission to sell their base were considered. While one member was granted release, no action was taken on Dufault's request.

On October 31, 1968, the board met, and again Leon Dufault was present. The release of Conrad Dufault was not discussed; however, a bank loan to the co-op to allow the co-op to purchase 344,025 pounds of base was discussed and a motion was passed giving the manager the authority to purchase base at 35 cents per pound.

Sometime after this meeting, Scymanski contacted Jack Rutherford to discuss his (Scymanski's) agreement to purchase Conrad Dufault's base. While no understanding was reached, the possibility of Scymanski reselling the base back to the co-op was considered. Accordingly, at the next meeting of the board, on November 5, it was reported that Scymanski had agreed to deliver to the co-op the hops grown through the remainder of Dufault's membership term, that is, through the 1972 crop. In addition, it was reported that Scymanski was willing to either sell the base back to the co-op at the end of the membership term for market value, or, to make a contract to deliver the hops to the co-op for the years following 1972. Leon Dufault then made a motion to release Conrad to sell the base to Scymanski and to accept Scymanski's delivery through the 1972 crop at which time the co-op would purchase the base from him at 35 cents per pound[1] for the base. This motion

---

[1]There is a conflict as to what the resale price was to be. While the minutes state the price at 40 cents, the testimony and the drawn contract indicated, and the trial court found, that the contemplated price was 35 cents per pound.

was passed, and the proposition was presented to Scymanski. Scymanski found the offer of resale at 35 cents per pound at the end of the 1972 crop year unacceptable.

After Scymanski's rejection, no further action was taken by the co-op on the matter, and Conrad Dufault was not given his release. Being anxious to sell, Dufault finally contacted the co-op to ascertain their willingness to purchase the base. The co-op agreed to purchase it at 35 cents per pound and the sale was made.

Subsequently, Scymanski started an action against Conrad Dufault for breach of contract, and against the co-op on a theory of interference with business or contractual relations. In addition, Scymanski sought to impress a constructive trust on the base and thus have the base transferred to him. The trial court, sitting without a jury, dismissed defendant Dufault on the ground that the contract between him and Scymanski was oral, and thus violated the statute of frauds. However, the court found against the co-op for interference with a business relationship, but declined to transfer the base and instead awarded damages of $61,215.42. The co-op appealed, and Scymanski cross-appealed from the denial of a constructive trust and transfer of the base.

■ The elements for the tort of interference with business relations have been repeatedly stated by this court as:

> (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Calbom v. Knudtzon*, 65 Wn.2d 157, 162, 396 P.2d 148 (1964). *See also, F. D. Hill & Co. v. Wallerich*, 67 Wn.2d 409, 407 P.2d 956 (1965); *Corinthian Corp. v. White & Bollard, Inc.*, 74 Wn.2d 50, 442 P.2d 950 (1968).

■ Appellant argues that these elements are not met here. It is first argued that to be liable for inducing a

breach of a business relationship there must be a binding, enforceable contract, and since the basic agreement here was oral and unenforceable under the statute of frauds the co-op cannot be held liable for inducing its breach. However, since this is a tort action based on wrongful interference, something less than a binding enforceable contract is required. As we stated in *F. D. Hill & Co. v. Wallerich, supra* at 412:

> The statute of frauds defense which might be available to the seller McPhail is not available to defendants here since they are strangers to the contract. *Backus v. Feeks,* 71 Wash. 508, 129 Pac. 86 (1913). Moreover, the third cause of action, upon which plaintiffs recovered, is not based upon contract as such but is an action in tort. The existence of a valid enforceable contract is not a prerequisite to the maintenance of the action. *Hein v. Chrysler Corp.,* 45 Wn.2d 586, 589, 277 P.2d 708 (1954).

The Restatement of Torts § 766 (1939) outlines two types of situations constituting interference with a business relationship:

> § 766. GENERAL PRINCIPLE.
> Except as stated in Section 698, one who, without a privilege to do so, induces or otherwise purposely causes a third person not to
> (a) perform a contract with another, or
> (b) enter into or continue a business relation with another
> is liable to the other for the harm caused thereby.

The proposed redraft of Restatement (Second) of Torts (Tent. Draft No. 14, 1969), further defines this principle:

> § 766A. INTENTIONAL INTERFERENCE WITH PROSPECTIVE CONTRACTS
> One who purposely induces or otherwise purposely causes a third person not to enter into or continue a prospective contractual relation with another, other than that of a contract to marry, is subject to liability to the other for loss of the benefits of the relation.

In the notes following this section, comment *c* states:

> *c. Type of relation.* The relations protected against intentional interference by the rule stated in this Section

include any prospective contractual relations, other than those leading to contracts to marry (see § 698), where the potential contract would be of pecuniary value to the plaintiff. Included are interferences with the prospect of obtaining employment or employees, the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts.

That the tort lies in interfering with business expectancies is further explained in 1 F. Harper and F. James, The Law of Torts § 6.11 (1956), at 510:

Although the law does not extend its protection as far in the case of precontractual interferences as it does when existing contracts have been interfered with, it draws a line beyond which no member of the community may go in interrupting contractual negotiations or otherwise intentionally intermeddling with the business affairs of others. The interest protected is different here than that considered in the preceding sections. Instead of the interest in the security of contracts already made, it is the interest in reasonable expectations of economic advantage. This, of course, involves society's interest in affording to the individual a fair opportunity to conduct his legitimate business affairs without interruption from others except in so far as such interferences are sanctioned by the "rules of the game" which society has adopted.

*See also*, W. Prosser, Handbook of the Law of Torts § 130 (4th ed. 1971).

Our cases also adopt this principle. The elements outlined above speak in terms of "a valid contractual relationship or *business expectancy.*" And, as pointed out in *F. D. Hill & Co. v. Wallerich*, 67 Wn.2d 409, 415, 407 P.2d 956 (1965):

In brief, the tort consists in the wrongful interference with an existing *business relationship between parties, in which inhered a reasonable expectancy of fruition* except for such interference, and damage resulted therefrom.

(Italics ours.)

We conclude that an existing enforceable contract is not necessary to support an action for interference with business relationships. All that is needed is a relationship between parties contemplating a contract, with at least a

reasonable expectancy of fruition. And this relationship must be known, or reasonably apparent, to the interferor. Depending upon the strength of the evidence, liability may lie for this interference.

In the present case, there is ample evidence to show a business relationship between Conrad Dufault and plaintiff. All that remained to be done to complete their transaction was the execution of the lease agreement, which the attorney was preparing at the instruction of the parties, and to check on the rights of the co-op. We conclude that there existed a business relationship susceptible to interference.

The next element requires knowledge by the interferor of the business relationship. There is substantial evidence in the record that the board of directors of the co-op had actual knowledge of the Dufault-Scymanski deal. Conrad Dufault testified that he contacted Jack Rutherford, manager of the co-op, a few days after the meeting in the attorney's office to discuss the sale procedure. Jack Rutherford testified that at the October 23 meeting, where the release of Dufault was first presented, it was very likely that the Dufault-Scymanski deal was discussed, and in any event he was informed of the deal by Leon Dufault at that time. He further testified that he was aware of the deal prior to the November 5 meeting. Elie Patnode, another member of the co-op board, also testified that the co-op learned of the deal by the October 23 meeting. In any event, the minutes of the November 5 meeting reflect that the transaction was known and discussed by the board at that time, which was when the sell-back proposition with Scymanski was formulated.

The next, and most critical element, requires intentional interference inducing or causing a breach or termination of the relationship or expectancy. The trial court found that the co-op did intentionally interfere with the transaction, and we agree.

Although not required to do so, Conrad Dufault gave a 30-day notice to the co-op of his intent to sell his base allotment. During that time, no one in the co-op indicated a

desire to buy, and thus at that time he was free to sell to any outsider subject to any legitimate rights assertable by the co-op. The bylaws are clear that the only right the co-op could legitimately assert would be to require written permission to sell, *but that was not* required if the purchaser agreed to deliver the hops to the co-op for the remainder of the member's term. Here, Scymanski at all times agreed to deliver the hops to the co-op for the remainder of Dufault's membership.

This did not satisfy the co-op. Instead, the proposal was made to Scymanski that at the end of Dufault's term the base was to be resold to the co-op for 35 cents per pound. The co-op had no authority to require such a condition. Scymanski had already agreed to deliver the hops to the co-op during Dufault's term, which is the only legal right the co-op had. Stated another way, the release of Dufault to complete his sale should not have been conditioned upon the conclusion of a business arrangement between the co-op and Scymanski.

■ Furthermore, the actions of the co-op caused an unwarranted delay in the completion of the transaction. Agreement was reached between Scymanski and Dufault on October 15. The release of Dufault to sell was brought up at the board meeting on October 23, but no action was taken on the Dufault release. Finally, on November 5, the board considered the resale proposition and formulated the unwarranted counter offer. Upon its rejection, no further action was taken by the co-op. The result was a stalemate, and, finally, a capitulation and sale by Conrad Dufault to the co-op. If such interference was the moving cause of the termination (*Valley Land Office, Inc. v. O'Grady*, 72 Wn.2d 247, 432 P.2d 850 (1967)), then the interference is actionable. The record supports the trial court's conclusion that absent the invalid condition imposed by the co-op, the sale to plaintiff would have been completed. As Conrad Dufault testified:

Q. You felt it was because he didn't agree to the Co-op's condition—I mean the condition that he return the base..

A. Yeah. Q. You said earlier that you felt you were forced in effect to sell to the Co-op, didn't you? A. This is what happened, yes. Q. And that's why you ultimately sold to the Co-op, isn't that correct? A. Yes.

And, also:

Q. Why did you sell to the Co-op? . . . A. Well, because the thing was being 'drug' on and I was of the opinion that the deal with Pete wasn't going to go through. Besides that I had a large carry-over at the bank that I was paying interest on and I was interested in getting some money and stopping that.

We agree with the trial court that there was an intentional interference inducing or causing a break or termination of the relationship or expectancy.

■ But the co-op argues the defense of privilege for such interference. Concerning such a defense we said in *Calbom v. Knudtzon,* 65 Wn.2d 157, 163, 396 P.2d 148 (1964):

The burden of showing privilege for interference with the expectancy involved rests upon the interferor. . . . The basic issue raised by the assertion of the defense is whether, under the circumstances of the particular case, the interferor's conduct is justifiable, bearing in mind such factors as the nature of the interferor's conduct, the character of the expectancy with which the conduct interferes, the relationship between the various parties, the interest sought to be advanced by the interferor, and the social desirability of protecting the expectancy or the interferor's freedom of action.

Specifically, the co-op claims its conduct was privileged by virtue of legitimate business competition with Scymanski, and also privileged as a proper protection of its financial interest in the business of Conrad Dufault. (*See* Restatement of Torts §§ 738, 769 and 773 (1939).) The problem with the co-op's argument is that it can have no greater interest in the business of its members and their prospective transferees, than is granted to it by its own bylaws and its contracts with its members. As already noted, both Dufault and Scymanski agreed to all *legitimate* conditions imposed by the co-op.

Having concluded that the co-op is liable for interfering with the business relationship, there remains the question of remedy. In his amended complaint Scymanski prayed for the transfer of the base to him, or in the alternative for money damages. The trial court, concluding that the actions of·the co-op were not unconscionable, declined to impose a constructive trust and transfer the base. Money damages were instead assessed in the amount of $61,215.42. This was determined by taking the price of the base at the time of trial at the then market price of 80 cents per pound, and subtracting therefrom the 35 cents a pound price Scymanski would have paid absent the interference, plus interest of 8 per cent on the funds he retained. In addition, the court found that the co-op should pay a rental value of 5 cents per pound for use of the base in 1969 and 6 cents per pound for use in 1970.

The co-op contests this determination arguing that the sum is computed erroneously, that rental value should not be recovered because it would constitute a duplication of damages, that the measure of damages was erroneous, and that plaintiff failed to mitigate damages by purchasing the equivalent base elsewhere. Plaintiff cross-appeals the trial court's denial of a constructive trust and refusal to transfer the base.

█ We agree with plaintiff that a constructive trust should be impressed on the base for plaintiff's benefit. The principle controlling the application of constructive trusts is set forth in *Seventh Elect Church v. First Seattle Dexter Horton Nat'l Bank*, 162 Wash. 437, 440, 299 P. 359 (1931):

> Where, for any reason, the legal title to property is placed in one person under such circumstances as to make it inequitable for him to enjoy the beneficial interest, a trust will be implied in favor of the persons entitled thereto. This arises by construction of equity, independently of the intention of the parties. Equity will raise a constructive trust and compel restoration, where one through actual fraud, abuse of confidence reposed and accepted, or through other questionable means, gains something for himself which, in equity and good con-

science, he should not be permitted to hold. 26 R. C. L. 1236, 1237, 35 A. L. R. 307; *Rozell v. Vansyckle,* 11 Wash. 79, 39 Pac. 270; *Pollard v. McKenney,* 69 Neb. 742, 96 N. W. 679, 101 N. W. 9; *Quinn v. Phipps,* 93 Fla. 805, 113 South. 419, 54 A. L. R. 1173; *Scott v. Thompson,* 21 Iowa 599.

In *Dexter Horton Bldg. Co. v. King County,* 10 Wn.2d 186, 191, 116 P.2d 507 (1941), we said:

> When property has been acquired under such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts such holder into a trustee. Perry on Trusts, 309, § 183.

*See also, Viewcrest Co-op Ass'n v. Deer,* 70 Wn.2d 290, 422 P.2d 832 (1967), and *Kausky v. Kosten,* 27 Wn.2d 721, 727, 179 P.2d 950 (1947), where this court discussed the requirements for imposing a constructive trust at some length.

While the trial court found that the co-op's conduct and its acquisition of the base was not unconscionable, this does not prevent a constructive trust from being imposed. A constructive trust may arise even though acquisition of the property was not wrongful. It arises where the retention of the property would result in the unjust enrichment of the person retaining it. 5 A. Scott, The Law of Trusts, § 462.2, at 3417 (3d ed. 1967); *see also,* Restatement of Restitution § 160 (1937). We have here a defendant who has intentionally interfered with another's business relationship and as a result of such interference has acquired the property that was the subject of that relationship. A constructive trust for the benefit of Scymanski during the period of improper retention, and a final transfer of the property for the price originally agreed upon, is the appropriate remedy.

In addition to the imposition of the constructive trust, the co-op should also pay a rental for the use of the base during the improper retention period. The trial court found that a reasonable rental value would be 5 cents per pound for 1969, and 6 cents per pound for 1970. As no rental value was fixed for the balance of the retention period, the trial court, on remand, should determine a reasonable rental for the period following 1970.

In return, Scymanski will be required to pay the original purchase price of 35 cents per pound to the co-op, plus interest at 8 per cent on this amount for the trust period. The trial court is instructed on remand to determine what the interest amount should be.

One final point should be mentioned. The co-op argues that Scymanski had a duty to mitigate his damages by acquiring base elsewhere and that any obtained (Scymanski did buy some 70,000 pounds elsewhere) should be credited to the co-op. However, this overlooks the fact that Scymanski was at all times material, attempting to acquire as much base as possible, not merely to acquire the amount offered by Conrad Dufault. The burden of proving lack of mitigation efforts was upon the co-op. We agree with the trial court that the burden was not met.

In conclusion, we find that the appellant co-op is liable for interfering with plaintiff's business relationship with Conrad Dufault. We also find that it would be unconscionable to allow the co-op to retain the benefits of property acquired through such conduct and that the imposition of a constructive trust is the appropriate remedy. This case is remanded to the trial court for a modified judgment consistent with this opinion.

HAMILTON, C.J., FINLEY, ROSELLINI, HUNTER, HALE, STAFFORD, and WRIGHT, JJ., concur.

NEILL, J., concurs in the result.

Petition for rehearing denied February 23, 1972.