# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Estate of:<br><br>JOSEPH L'AMARCA<br><br>                          Decedent. | No. 52049-4-II<br><br>UNPUBLISHED OPINION |

LEE, A.C.J. — Teresa L'Amarca appeals the superior court's order dismissing with prejudice her Trust and Estate Dispute Resolution Action (TEDRA) petition. She argues that (1) findings of fact were not supported by substantial evidence; (2) the trial court erred in concluding that the personal representative of the estate (PR), Jeannie L'Amarca, did not fail to fulfill her fiduciary duty as PR of the estate; (3) the trial court erred in concluding that Joseph L'Amarca, Jr. (Junior) did not commit common law fraud when he filed a creditor's claim; (4) the trial court erred in rejecting Teresa's[1] argument that a constructive trust was created in the property transferred to Junior to satisfy his creditor's claim; and (5) the trial court erred in awarding attorney fees to Junior and Jeannie.

We hold that (1) challenges to the trial court's findings of fact fail, (2) the trial court did not err in concluding that Jeannie did not fail to fulfill her fiduciary duty as PR of the estate, (3) the trial court did not err in concluding that Junior did not commit common law fraud when he

---

[1] Because the parties have the same last name, they are referred to by their first names for clarity. No disrespect is intended.

filed a creditor's claim, (4) the trial court did not err in rejecting Teresa's argument that a constructive trust was created, and (5) the trial court did not err in awarding attorney fees to Junior and Jeannie. Accordingly, we affirm.

FACTS

This TEDRA petition involves a dispute over whether Junior owns the property located at 3311 Bridgeport Way, University Place, Washington (Bridgeport property) or whether the Bridgeport property is an asset of Joseph J. L'Amarca, Sr.'s (Senior) estate.

A. HISTORY OF THE PROPERTY

Junior had contracted to purchase the Bridgeport property in 1988 from Tony Trunk. Senior, Junior's father, lived on the property from 1993 to 2016. While he lived there, Senior made the payments to Trunk pursuant to Junior's contract with Trunk. Trunk gave Junior a statutory warranty deed for the Bridgeport property in 2006, after the purchase contract between Junior and Trunk had been fulfilled.

1. HELOC

In 2003, Senior took out a home equity line of credit (HELOC) on the Bridgeport property, claiming to own the property. In fact, Junior owned the property at that time, but Junior was not a signatory on the HELOC. At some point, Junior later became aware of the HELOC and protested.

2. 2004 Deed/Assignment

A Deed and Purchaser's Assignment of Real Estate Contract allegedly signed by Junior on October 28, 2004, (2004 Deed/Assignment) quitclaimed the Bridgeport property to Senior. This document also assigned Junior's real estate contract with Trunk to Senior. The 2004

Deed/Assignment was notarized by Douglas Sulkosky, an attorney. However, Junior claims he never signed the 2004 Deed/Assignment and that the signature on the deed was not his. Sulkosky had no recollection of notarizing the 2004 Deed/Assignment.

### 3. 2006 Statutory Warranty Deed

In 2006, after Junior paid off the real estate contract, Trunk gave Junior a statutory warranty deed. Trunk "unambiguously" understood that the he sold the Bridgeport property to Junior in 2006. Verbatim Report of Proceedings (VRP) (April 30, 2018) at 177.

### 4. Simultaneous Recording of the Deeds

Both the 2004 Deed/Assignment and the 2006 statutory warranty deed were recorded on October 13, 2006. Junior did not know who recorded the 2004 assignment.

## B. Junior's Creditor's Claim

Senior died testate. Senior's Will left his entire estate to his two daughters, Teresa L'Amarca and Jeannie L'Amarca. The trial court found that the estate was solvent and appointed Jeannie as the PR of the Estate with nonintervention powers.[2]

Junior filed a creditor's claim with supporting documentation, asserting that Bridgeport property belonged to him and that he had never signed the 2004 Deed/Assignment that purported to assign the Bridgeport property to Senior. Jeannie, as PR of the estate, reviewed Trunk's declaration, listened to a phone conversation between Junior and Sulkosky, reviewed Sulkosky's

---

[2] Senior's Will appointed Teresa as the PR and Jeannie as the PR in the event Teresa is declines or is unable to act as the PR. Teresa was disqualified as a PR based on her criminal record. Linda Kartes, their mother and ex-wife of Senior, petitioned to be the PR, and was appointed by the trial court as the PR of Senior's estate. However, the trial court later vacated the order appointing Kartes as PR of Senior's estate and appointed Jeannie as the PR because Jeannie had been nominated as PR in Senior's Will in the event Teresa was unable to serve as PR.

declaration, and reviewed the contract between Trunk and Junior. After her review, Jeannie, as PR of the estate, accepted Junior's creditor's claim and signed a settlement agreement with Junior, quitclaiming the Bridgeport property to Junior.

Teresa filed a civil suit in superior court against Junior, alleging fraud. The superior court dismissed Teresa's civil suit under Civil Rule 12(b)(6).

Teresa then filed a TEDRA petition, alleging that Jeannie and Junior committed fraud on the Estate, were involved in a fraudulent transfer of the Bridgeport property, and intentionally interfered with Teresa's right to an inheritance. Teresa also alleged that Jeannie breached her duty of good faith as PR of the Estate when she quitclaimed the Bridgeport property to Junior and was unfit to serve. Teresa's petition did not claim that the Bridgeport property should be held in a constructive trust. However, she raised a constructive trust argument in her Second Supplemental Memorandum in Support of the Court's Equity and Legal Jurisdiction.

C.    BENCH TRIAL

The trial court held a bench trial to determine Teresa's TEDRA petition. In addition to the facts discussed above, the following evidence was presented to the trial court.

1.    Evidence Regarding the Deeds and Assignment

Douglas Sulkosky, an attorney and notary public, testified that his notary stamp appears on the 2004 Deed/Assignment. According to Sulkosky, a person came in identifying himself as "Joseph L'Amarca Jr." VRP (April 30, 2018) at 34. His practice was to ask for identification when notarizing a signature of someone he did not know. He did not know Joseph L'Amarca, Jr., so he would have "asked [Junior] for ID." VPR (April 30, 2018) at 34.

Sulkosky represented Senior in a few lawsuits between the years 2004 and 2006. Sulkosky's billings to Senior for legal services rendered show that Sulkosky's invoices were sent to Senior at "P.O. Box 64237." Clerk's Papers (CP) at 339.

In January 2017, Sulkosky received a phone call from Junior saying that there was a dispute over a contract. Junior stated that he had never signed the 2004 Deed/Assignment and asked Sulkosky to prepare a declaration stating that it was not Junior who signed the document.

Pursuant to that conversation, Sulkosky prepared a declaration dated January 2017, which was admitted in trial. The declaration stated that the person who signed the deed was not Senior. Sulkosky's declaration stated that the person who signed the deed was Joseph J. L'Amarca - there was no designation of Junior.

Sulkosky signed another declaration on May 11, 2017, which also was admitted in trial. This declaration noted that he had an appointment in his calendar with Junior on October 28, 2004, and that it his customary practice to review a person's ID before notarizing a signature.

At trial, Sulkosky's testified that his recollection of the 2004 Deed/Assignment preparation was based on an entry in his calendar. He did not have any specific recollection of the transaction. However, he did recall that the person who picked up the 2004 Deed/Assignment the next day was Senior. Sulkosky also testified that he would not know whether the person who signed the deed was Junior or someone else.

Hanz Saenz also signed a declaration that was admitted in trial. Saenz stated that he was in a vehicle with Junior when Junior called Sulkosky on January 24, 2017.

> In said conversation, a man by the name of Sulkosky, directed Joey L'Amarca to go to his office to retrieve a Declaration, detailing an event, whereby "Joseph L'Amarca, Sr. went to Sulkosky & purported to be Joseph L'Amarca, Jr. Joey

> L'Amarca did not ask for said document – rather it was Sulkosky's organic and stern instruction to provide it. In retrospect, it was obvious Mr. Sulkosky realized he had erroneously notarized a document presented by Joseph L'Amarca, Sr., instead of Joseph L'Amarca, Jr.

CP at 1047-48.

Brian Forrest testified that he had a certificate from the International School of Forensic Document Examination (ISFDC), where he learned handwriting identification and how to compare signatures. The program, consisting of online courses, was for two years. The school is not accredited. *See* CP at 268 (Declaration from ISFDC describing the program and noting that forensic handwriting examination is not "a degree which is offered at any accredited 4-year college-degree programs."). Forrest also did an apprenticeship, in which his mock trials were over the phone. He did not have any in-person apprenticeship training. This was Forrest's first time testifying in court as an expert. Forrest also testified about how he compares signatures. After this foundational testimony, the trial court qualified Forrest as an expert but stated, "[H]ow much weight I give to his testimony is anybody's guess at this point." VRP (April 30, 2018) at 122.

Forrest also testified that he had originally examined for his report only birthday cards signed by Junior and the signature on Junior's settlement agreement for the creditor's claim. The birthday cards only had Junior's first name, not his full signature. Forrest was later given more signatures to review, but he did not update his report.

Forrest compared the 2004 Deed/Assignment to other documents with verifiable signatures of Junior. He also looked at the verifiable signatures of Senior. One of those documents included a signed check from Senior's bank account with a printed address of "P.O. Box 64237." CP at 829. Forrest stated that people's signatures change over time. The comparisons he made were

between the 2004 Deed/Assignment and 2017 verified signatures. The additional signatures he looked at were closer in time to 2004.

According to Forrest, there was very little variation in Junior's signature from 1990 to 2017. Based on his examination of the documents, the signature on the 2004 Deed/Assignment was more probably than not Junior's and not Senior's.

Tony Trunk testified that he had known both Senior and Junior since 1988. In 1988, he and Junior executed a real estate contract for the Bridgeport property. Senior would mail him payments while he lived on the property. But Trunk unambiguously understood that the Bridgeport property was being sold to the son, Joseph J. L'Amarca, Jr. In 2006, he gave Junior a statutory warranty deed. Although the statutory warranty deed he signed did not include "Jr." for "Joseph J. L'Amarca," that was a clerical error. VRP (April 30, 2018) at 177; CP at 974-75. It was never his intention to convey the property to anyone except Junior.

2.      Evidence Regarding Senior

Paul Rogers provided a declaration stating that he had previously worked for Senior and "observed Mr. L'Amarca, Sr. periodically borrow Joseph J. L'Amarca, Jr.'s WA Driver's License, for the purpose of saving on dump fees, as Joey had a Tacoma address, versus his father's University Place address." CP at 1049-50.

Gregory Marks, Junior's childhood friend and who knew the L'Amarca family since the 1980s, testified that he had personal knowledge of Senior using Junior's identification for "dump runs." VRP (May 2, 2018) at 341. When asked if he personally saw Senior using Junior's ID more than once, he replied, "It wasn't his ID but he implied Joey, just Joey." VRP (May 2, 2018) at 337. Senior generally did not go by the name Joey. Marks testified that "it would be Joseph

7

L'Amarca when the mix-ups would happen." VRP (May 2, 2018) at 337. Additionally, there was a mix up with the names in the "US Bank incident." VRP (May 2, 2018) at 341.

Linda Kartes, the mother of Junior, Jeannie, Teresa, and Anthony L'Amarca, and Senior's ex-wife, testified that she had previously served as a PR in Senior's probate estate. During her time as PR, she knew about the HELOC, which she considered to be a debt of the estate.

3.      Evidence Regarding the Creditor's Claim

Junior testified that he is currently the owner of the Bridgeport property. He had entered into a contract with Trunk to purchase the property and made monthly installment payments after an initial balloon payment in 1988. He allowed his father to live on the property beginning in 1993. His father made the payments to Trunk while he lived there.

Between 1988 and the time his father moved in, Junior rented the Bridgeport property out to tenants. He filed an eviction action against tenants in 1990. He owned the Bridgeport property at the time of the HELOC, but he was not a signatory on the line of credit. CP at 636 (Equity Line of Credit Deed of Trust between "Joseph L'Amarca" and Washington Mutual Bank showing the address as Bridgeport).

After the payments to Trunk were completed in 2006, Trunk conveyed the Bridgeport property through a statutory warranty deed to Junior. That deed was recorded on October 13, 2006.

Junior did not deed the property to his father in 2004. He did not sign an assignment of his contract with Trunk to his father. The signature on the 2004 Deed/Assignment was not his signature. He did not know who recorded the 2004 Deed/Assignment. After finding out about the

2004 Deed/Assignment, Junior filed a creditor's claim asserting ownership of the Bridgeport property.

Jeannie testified that she concluded that Junior was the owner of the Bridgeport property. She based her conclusion on a review of Trunk's declaration, the phone conversation between Junior and Sulkosky for which she was present, Sulkosky's January 2017 declaration, the contract between Junior and Trunk, and the possibility of being sued for using estate fees to fight the claim. She concluded that "the contact was between my brother and [Trunk] and that the property belonged to my brother." VRP (May 2, 2018) at 363. Also, Junior had told her that he owned the property. She described her relationship with Junior as, "He looks out for me and especially since our dad passed away he's been the only family that I've had." VRP (May 2, 2018) at 364-65. Junior has not lied to her in the past.

Jeannie also testified that there was not much money in the estate and she knew how expensive attorney fees were. She made the best decision for the estate.

Jeannie further testified about the status report filed for the estate, which gave a listing of the accounts that the estate had and how much money was in them. She first learned of the Estate's bank accounts in April 2017, when she received the Estate documents from Kartes. When she was first appointed as PR, she only knew about the Chase account. She closed that account and opened a new one with U.S. Bank. At the time of the trial, there was $149.67 in the account.

As to the value of the Bridgeport property, the Pierce County Assessor believed the property was worth about $200,000. Jeannie did not consider getting a loan against the property to pay for attorney's fees because the property did not belong to the estate.

There were other properties in the estate. But the only source of income for the estate would be liquidating assets.

Before she became the PR, she was not aware of the 2004 Deed/Assignment. She did not hear about the 2004 Deed/Assignment until shortly before Junior filed his creditor's claim.

In the settlement agreement for the creditor's claim, title interest in the Bridgeport property was transferred to Junior. Jeannie did not have any interest in the Bridgeport property after she quitclaimed the estate's interest to Junior. She and Teresa were the beneficiaries of Senior's Will, so transferring Bridgeport to Junior reduced her potential bequest as a beneficiary.

D.     THE TRIAL COURT'S FINDINGS OF FACTS AND CONCLUSIONS OF LAW

The trial court found in relevant part:

> 1.16. At various times relevant to this TEDRA action, L'Amarca, Sr. used L'Amarca, Jr.'s identification and name.
>     . . . .
> 1.24. On February 3, 2017, L'Amarca Jr. filed a creditor's claim stating that he was the real owner in interest to the Property and that L'Amarca Sr. had forged L'Amarca Jr.'s signature on a Deed and Assignment of Real Estate Contract (the "Assignment") dated October 28, 2004.
>     . . . .
> 1.30. The Assignment was signed by a person representing himself to be Joseph L'Amarca, Jr.; L'Amarca, Jr. credibly testified he did not execute and deliver the Assignment.
> 1.31. Attorney Douglas Sulkosky notarized the signature on the Assignment; however, Mr. Sulkosky had no recollection of having done so; no recollection that the signer was in fact L'Amarca, Jr.; he recalled that someone representing himself to be L'Amarca, Jr. signed the Assignment.
> 1.32. There is no credible evidence to believe that L'Amarca, Jr. assigned the Property to L'Amarca, Sr.
> 1.33. Although qualified by the Court as a hand writing expert, the testimony of Brian Forrest is not credible. Mr. Forrest's education consisted of a two-year on line course from an unaccredited school; he had never testified as an expert before this TEDRA proceeding; and his opinions, which are based upon a comparison of the Assignment dated October 28, 2004 to the January 30, 2017 creditor claim filed by L'Amarca, Jr., and uncertified greeting cards bearing the signature of "Joey", all

10

together do not credibly support his conclusions that the signature on the Assignment looks like that of L'Amarca, Jr.

. . . .

1.35.   Mr. Forrest's testimony was not credible or reliable due to the timing of the signatures compared, his lack of credentials, and the lack of verified samples.

. . . .

1.38.   There is no credible evidence to explain why the Assignment was not recorded contemporaneously with its date in 2004.

1.39.   There is no credible evidence to explain why L'Amarca, Jr. would transfer the Property in 2004 for no consideration.

1.40.   The Personal Representative, Jeannie L'Amarca's testimony was the most credible of the witnesses who testified; as a legatee of the estate, she had nothing to gain personally and risked personal financial loss by accepting L'Amarca, Jr.'s creditor claim and settling it in the manner she did.

1.41.   . . . [Jeannie's] administration of L'Amarca, Jr.'s creditor claim was done in good faith and was not a breach of her fiduciary duties as Personal Representative.

CP at 512-15.[3]

---

[3]   The trial court also made the following findings of fact, which Teresa does not challenge on appeal:

1.8.   Tony Trunk credibly testified that his intent was to deliver the Statutory Warranty (fulfillment) Deed to L'Amarca, Jr. specifically and that the notation in the Deed of "Joseph J. L'Amarca" was an unintended clerical error on his part.

. . . .

1.14.   L'Amarca, Sr. used the following names to identify himself in his business and interpersonal interactions during his lifetime, including, Joseph L'Amarca, Joe L'Amarca, Joseph L'Amarca, Sr., and Joseph L'Amarca, Jr.

. . . .

1.17.   In July 2003, L'Amarca, Sr. fraudulently obtained a home equity line of credit (HELOC) from Washington Mutual Bank by representing that he was the owner of the Property. There are no documents, testimony or other evidence to indicate that L'Amarca Sr., had any right, title or ownership interest in the Property in July 2003.

. . . .

1.36.   The Court declined to adopt Mr. Forrest's opinion.

CP at 511-515.  Because these findings are not challenged, they are verities on appeal. *Humphrey Indus., Ltd. v. Clay St. Assocs.,* 176 Wn.2d 662, 675, 295 P.3d 231 (2013).

Based on its findings, the trial court concluded, in relevant part, that Teresa had failed to sustain her burden of proof to show Jeannie and Junior had committed common law fraud; the Bridgeport property was not an asset of the Estate, and Junior is the fee title owner of the Bridgeport property; and Jeannie did not breach her fiduciary duties as PR. The trial court dismissed Teresa's TEDRA petition and all claims against Jeannie and Junior with prejudice.

The trial court also ordered Teresa to reimburse Junior for his attorneys' fees and costs pursuant to 11.96A.150, in the amount of $47,087.87, which the court found was reasonable. Additionally, the trial court ordered Teresa to reimburse the PR of the estate, Jeannie, for attorneys' fees and costs pursuant to RCW 11.48.210 and RCW 11.96A.150 in the amount of $20,570, which the court deemed reasonable.

Teresa appeals.

## ANALYSIS

Teresa challenges the trial court's finding of fact 1.16, 1.30, 1.31, 1.32, 1.33, 1.35, 1.38, 1.39, 1.34, 1.40, and 1.41.

A.    STANDARD OF REVIEW

We apply a two-step standard of review for a trial court's findings of fact and conclusions of law: we determine if the trial court's findings of fact were supported by substantial evidence in the record, and if so, we next decide whether those findings of fact support the trial court's conclusions of law. *Landmark Development, Inc. v. City of Roy,* 138 Wn.2d 561, 573, 980 P.2d 1234 (1999) (citation omitted); *Johnny's Seafood Co. v. City of Tacoma,* 73 Wn. App. 415, 418, 869 P.2d 1097 (1994). "'Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise.'" *In re*

*Marriage of Griswold*, 112 Wn. App. 333, 339, 48 P.3d 1018 (2002) (quoting *Bering v. SHARE*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986) , *cert. dismissed*, 479 U.S. 1050 (1987)), *review denied*, 148 Wn.2d 1023 (2003). We review a trial court's conclusions of law de novo. *Casterline v. Robers*, 168 Wn. App. 376, 381, 284 P.3d 743 (2012).

B.      CHALLENGED FINDINGS OF FACT

Teresa challenges the trial court's findings of fact 1.16, 1.31, 1.33, and 1.39, but she provides no supporting argument or authority in her opening brief for any of these challenges as required by RAP 10.3(a)(6). When a plaintiff presents "no argument in their opening brief" on any claimed assignment of error, "the assignment of error is waived." *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). We consider Teresa's challenge to findings of fact 1.16, 1.31,[4] 1.33, and 1.39 waived. *Id.*

With regard to Teresa's challenge to the trial court's findings of fact 1.30, 1.33, 1.35, and 1.40, these findings of fact are credibility determinations made by the trial court. We defer to the trier of fact on issues of witness credibility, conflicting testimony, and the persuasiveness of the evidence. *State v. Walton*, 64 Wn. App. 410, 415–16, 824 P.2d 533, *review denied*, 119 Wn.2d 1011 (1992). Credibility determinations cannot be reviewed on appeal, as credibility determinations are solely for the trier of fact. *Morse v. Antonellis*, 149 Wn.2d 572, 574, 70 P.3d

---

[4] Teresa's challenge to finding of fact 1.31 also fails because she only argues that "Jeannie could not have rationally based a belief as to the genuineness of the October 28, 2004 deed signature on Sulkosky's January 30, 2017 declaration." Br. of App. at 46. But the trial court did not find that Jeannie could have rationally believed that the 2004 Deed/Assignment was genuine. Rather, the trial court found that Mr. Sulkosky had no recollection of having notarized the signature and no recollection that the signer was in fact Joseph L'Amarca, Jr., but he recalled that someone representing himself to be Joseph L'Amarca, Jr. signed the Assignment.

125 (2003). Because Teresa assigns error to the trial court's credibility determinations, we do not review these findings.[5]

With regard to Teresa's challenge to the trial court's findings of fact 1.32, 1.38, and 1.41, Teresa's arguments essentially ask this court to reweigh the evidence and make credibility determinations. We decline to do so.

1.     Finding of Fact 1.32

Teresa challenges finding of fact 1.32, which states, "There is no credible evidence to believe that L'Amarca, Jr. assigned the Property to L'Amarca, Sr.," arguing that the "testimony of the disinterested notary (Sulkosky) and the disinterested handwriting and signature expert, (Forrest)" prove that Junior signed the 2004 Deed/Assignment. CP at 514; Br. of App. at 41. We disagree.

Here, there is substantial evidence that Sulkosky had no recollection of having notarized Junior's signature and no recollection that the signer of the 2004 Deed/Assignment was indeed Junior. The trial court also found that Forrest's testimony was not credible.[6] This court does not review credibility determinations. *Morse*, 149 Wn.2d at 574. Thus, the trial court's determination stands, and this court will disregard Forrest's testimony. *See Bale v. Allison*, 173 Wn. App. 435,

---

[5] Jeannie relies on *State v. Garza*, 150 Wn.2d 360, 77 P.3d 347 (2003), to argue that credibility determinations are reviewed for abuse of discretion. But *Garza* is inapposite because it discussed the factual determination of whether or not the defendant's absence from trial was voluntary. 150 Wn.2d at 366. The challenged finding was not a credibility determination.

[6] As discussed above, while this finding of fact was challenged, Teresa has failed to provide any arguments to support her challenge in her opening brief, and therefore, has waived this challenge. *Cowiche Canyon*, 118 Wn.2d at 809. Moreover, the trial court's credibility determination cannot be reviewed on appeal, as credibility determinations are solely for the trier of fact. *Morse*, 149 Wn.2d at 574.

459, 294 P.3d 789 (2013). And Junior testified that he did not execute and deliver the 2004 Deed/Assignment, which the court found to be credible.

Based on the evidence, a fair-minded rational person could believe that Junior did not assign the property to Senior. Therefore, the trial court's finding of fact 1.32 that "[t]here is no credible evidence to believe that L'Amarca, Jr. assigned the Property to L'Amarca, Sr." is supported by substantial evidence. CP at 514.

2.    Finding of Fact 1.38

Teresa challenges finding of fact 1.38, which states that "[t]here is no credible evidence to explain why the Assignment was not recorded contemporaneously with its date in 2004." CP at 515. She argues that

> the trial court erred in utilizing a supposed lack of credible evidence to explain the non-contemporaneous execution and recording of the [2004 Deed/Assignment] when the only person who could provide direct testimony on the subject, other than the party who directly benefitted from the simultaneously-recorded [2006 statutory warranty deed], is dead and the living party who directly benefitted provided no explanation for the deed-recording dates.

Br. of App. at 3. Teresa also argues that the simultaneous recording of the 2004 Deed/Assignment and the 2006 statutory warranty deed "is an event that is too unique to ignore and leads to only one conclusion: Joe, Jr. recorded both deeds and was the signator on the first one." Br. of App. at 41.

Here, Teresa's argument lacks merit because it asks this court to merely speculate why the October 28, 2004 Deed/Assignment was not recorded contemporaneously with its execution. Additionally, there is no evidence in the record to support the allegation that Junior recorded both deeds at the same time.

3. Finding of Fact 1.41

Teresa challenges finding of fact 1.41, which states in relevant part that "[Jeannie's] administration of L'Amarca, Jr.'s creditor claim was done in good faith and was not a breach of her fiduciary duties as Personal Representative."[7] CP at 515. Teresa argues that Jeannie did not inquire into the legality of the 2004 Deed/Assignment and did not inquire into whether or not the signature was valid to support her challenge.

To find good faith, one must maintain "a state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage." *Black's Law Dictionary* 808 (10th ed. 2014). Here, Jeannie testified that before accepting the creditor's claim, she considered the conversation between Junior and Sulkosky, Sulkosky's January 2017 declaration, the contract between Junior and Trunk, Trunk's

_____

[7] A trial court's designation of a finding is not determinative; rather, a conclusion of law mislabeled as a finding, will be treated as a conclusion. *Moulden & Sons, Inc. v. Osaka Landscaping & Nursery, Inc.*, 21 Wn. App. 194, 197, 584 P.2d 968 (1978).

> If a determination concerns whether the evidence showed that something occurred or existed, it is properly labeled a finding of fact, but if a determination is made by a process of legal reasoning from, or of interpretation of the legal significance of, the evidentiary facts, it is a conclusion of law.

*Moulden & Sons, Inc.*, 21 Wn. App. at 197-98, n.5.

It is clear that whether or not the personal representative acted in good faith is a finding of fact because it is an assertion that a phenomenon has occurred independent of any assertion as to its legal effect. However, whether or not Jeannie breached her fiduciary duties as a personal representative is a determination of the legal effect of acting in good faith and is thus a conclusion of law. Therefore, we review the trial court's determination of whether or not Jeannie breached her fiduciary duties as a conclusion of law.

declaration, and the possibility of being sued for using estate fees for fighting the claim. The real estate contract between Trunk and Junior included the suffix, "Jr." and Trunk stated in his declaration that he "unambiguously understood that the Property was being sold to the son, Joseph, J. L'Amarca, Jr., and not to his father." CP at 633-34, 974. Trunk further declared that his omission of the suffix from the statutory warranty deed was a clerical error.

Jeannie also testified that there was not much money in the estate. When she was first appointed as PR, she only knew about Chase bank account. She closed that account and opened a new one with U.S. Bank. At the time of the trial, there was $149.67 in the account. She testified that Junior had not lied to her in the past. Additionally, transferring the Bridgeport property to Junior reduced her potential bequest as beneficiary. The trial court found that Jeannie was the most credible of the witnesses that testified.

There is no evidence of fraud on Jeannie's part. Additionally, she did not seek unconscionable advantage as the transferring of the Bridgeport property to Junior reduced her potential bequest as beneficiary.

Thus, based on the evidence, a fair-minded rational person could be persuaded to believe that Jeannie acted in good faith in accepting Junior's creditor's claim. Therefore, the trial court's finding of fact 1.41 that Jeannie's "administration of L'Amarca, Jr.'s creditor claim was done in good faith" was supported by substantial evidence in the record. CP at 515. And, as further discussed below, that finding supports the trial court's conclusion that Jeannie did not breach her fiduciary duties as PR.

C.       TRIAL COURT'S FIDUCIARY DUTIES CONCLUSION

Teresa challenges conclusion of law 2.10, which states that "[t]he Personal Representative, Jeannie L'Amarca, has not breached her fiduciary duties as personal representative." CP at 516. Teresa argues that the trial court erred in dismissing her breach of fiduciary duty claim against Jeannie because she failed to perform a reasonable investigation to protect the estate from invalid and doubtful creditors; failed to inquire into the legality of the 2004 Deed/Assignment and whether the signature was valid before accepting Junior's creditor's claim; and lacked knowledge of real estate conveyancing law, relying instead on advice from counsel to fulfill her fiduciary duties. We disagree.

A "personal representative stands in a fiduciary relationship to those beneficially interested in the estate. [Sh]e is obligated to exercise the utmost good faith and diligence in administering the estate in the best interests of the heirs." *In re Estate of Larson*, 103 Wn.2d 517, 521, 694 P.2d 1051 (1985). In performing his or her fiduciary duty, the PR must "utilize the skill, judgment, and diligence which would be employed by the ordinarily cautious and prudent person in the management of his own trust affairs." *Hesthagen v. Harby*, 78 Wn.2d 934, 942, 481 P.2d 438 (1971). PRs "must refrain from self-dealing, administer the estate solely in the interest of the beneficiaries, and uphold their duty of loyalty to the beneficiaries.*" In re Estate of Jones*, 152 Wn.2d 1, 21, 93 P.3d 147 (2004).

RCW 11.48.010 states, "It shall be the duty of every personal representative to settle the estate, including the administration of any nonprobate assets within control of the personal representative under RCW 11.18.200, in his or her hands as rapidly and as quickly as possible, without sacrifice to the probate or nonprobate estate."

The trial court's finding of good faith supports the trial court's conclusion that Jeannie did not breach her fiduciary duties in administering the creditor claim because as a fiduciary, she must exercise the "utmost good faith and diligence in administering the estate in the best interest of the heirs." *Larson*, 103 Wn.2d at 521. And the trial court found that Jeannie was "the most credible of the witnesses who testified." CP at 515. The court also found that "as a legatee of the estate, she had nothing to gain personally and risked personal financial loss by accepting L'Amarca, Jr.'s creditor claim and settling it in the manner she did." CP at 515. This shows that Jeannie refrained from self-dealing and administered the creditor claim in the best interest of the beneficiaries by resolving the creditor's claim as efficiently as possible without depleting the estate of all its assets by litigating the claim. Thus, Jeannie attempted to settle the creditor's claim without sacrifice to the estate. RCW 11.48.010.

Although Jeannie transferred the Bridgeport property to Junior, she did so after weighing that result against paying attorney fees that could deplete the Estate's assets if she rejected the claim. Therefore, the trial court's findings of fact supports the conclusion that Jeannie did not breach her fiduciary duties as PR.

D.    COMMON LAW FRAUD CLAIMS

Teresa challenges the trial court's conclusion of law 2.4 and 2.5 wherein the trial court found that she failed to meet her burden to show common law fraud. Teresa argues that she proved the "nine badges" of common law fraud and that the trial court erred in dismissing her claims. Br. of App. at 40. Specifically, Teresa argues that she proved that Junior committed fraud based on

the testimony of Sulkosky and Forrest that the 2004 deed signature is that at Junior.[8]  She argues

that the circumstantial evidence of the simultaneous recordings of the 2004 Deed/Assignment and

the 2006 statutory warranty deed shows that Junior recorded both deeds and was the signator of

the 2004 Deed/Assignment.

> The nine elements of fraud are:
>
> (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff.

*Stiley v. Block*, 130 Wn.2d 486, 505, 925 P.2d 194 (1996).  "Each element of fraud must be

established by 'clear, cogent and convincing evidence.'"  *Id.* (quoting *Sigman v. Stevens-Norton,*

*Inc.,* 70 Wn.2d 915, 920, 425 P.2d 891 (1967)).  Clear, cogent, and convincing evidence exists

when the ultimate fact at issue is "highly probable."  *In re Dependency of K.S.C.,* 137 Wn.2d 918,

925, 976 P.2d 113 (1999).

Here, Junior filed a creditor's claim representing that he was the real owner of the

Bridgeport property, and thus, Junior made a material representation of existing fact.  We hold that

the trial court's conclusion of law 2.4 that Teresa failed to show by clear, cogent, and convincing

evidence that Junior committed common law fraud by falsely representing that he was the real

owner of the Bridgeport property is supported by its findings of fact.

---

[8]  Teresa only argues common law fraud with regard to Junior.  Teresa provides no argument to show she met her burden on her claim of common law fraud against Jeannie.  Therefore, we hold that Teresa has waived her challenge to the trial court's conclusions of law with regard to her common law fraud claim against Jeannie.  *Cowiche Canyon*, 118 Wn.2d at 809.

The trial court found that Junior credibly testified that he did not sign the 2004 Deed/Assignment, Sulkosky had no recollection that signor of the 2004 Deed/Assignment was in fact Junior, and there was no credible evidence to believe Junior had assigned the Bridgeport property to Senior. Although Forrest testified that it was Junior's signature on the 2004 Deed/Assignment, the trial court found that his testimony was not credible evidence to explain why Junior would transfer the property to Senior without consideration. These findings support the trial court's conclusion of law 2.4 and 2.5 that Teresa had failed to sustain her burden of proof by showing Junior committed common law fraud with clear, cogent, and convincing evidence. *Stiley*, 130 Wn.2d at 505. Thus, we hold that the trial court did not err in its conclusion of law 2.4 and 2.5 that Teresa failed to sustain her burden on her common law fraud claim against Junior.

E.     CONSTRUCTIVE TRUST

Teresa argues that "[t]he trial court was required to act on Teresa's claims even if all of the common law fraud elements could not be proved because a constructive trust was created when Bridgeport was transferred to Joe, Jr." Br. of App. at 38. We disagree.

Constructive trusts arising in equity are imposed when there is clear, cogent, and convincing evidence of the basis for impressing the trust. *Manning v. Mount St. Michael's Seminary,* 78 Wn.2d 542, 546, 477 P.2d 635 (1970). Constructive trusts are imposed for a violation of fiduciary duty. *Hesthagen*, 78 at 945-46.

"'In general, whenever the legal title to property, real or personal, has been obtained through . . . [a] circumstance[] which render[s] it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust.'" *Baker v. Leonard*, 120 Wn.2d. 538, 547, 843 P.2d 1050 (1993) (quoting *Kausky v. Kosten,* 27 Wn.2d 721,

727–28, 179 P.2d 950 (1947)). "'A constructive trust arises where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it.'" *Baker*, 120 Wn.2d at 547-48 (quoting *Proctor v. Forsythe,* 4 Wn. App. 238, 242, 480 P.2d 511 (1971)); *see also Thor v. McDearmid,* 63 Wn. App. 193, 206, 817 P.2d 1380 (1991)).

Here, the Bridgeport property was transferred to Junior, a third party. But as explained above, Jeannie did not violate her fiduciary duty as PR of the estate when she transferred the property to Junior. Thus, her actions do not render it unconscientious for Junior to retain and enjoy the Bridgeport property. Therefore, we hold that there is no basis for imposing a constructive trust.[9]

## F.    TRIAL COURT ATTORNEY FEES AWARD

Teresa argues that because Jeannie failed to fulfill her fiduciary duties as personal representative of the estate and because Junior engaged in fraud, it is fundamentally unfair to have Jeannie and Junior's fees and costs entered against her. We disagree.

We review a trial court's decision to award attorney fees under TEDRA for an abuse of discretion. *In re Estate of Black,* 153 Wn.2d 152, 173, 102 P.3d 796 (2004). A trial court abuses its discretion if its decision rests on unreasonable or untenable grounds. *Dix v. ICT Grp., Inc.,* 160 Wn.2d 826, 833, 161 P.3d 1016 (2007).

---

[9] Teresa also argues that the trial court erred in ruling "that Teresa did not have a right to bring claims against [Junior] and Jeannie on the estate's behalf." Br. of App. at 39. Because there is no citation to the record and no argument, we do not address this issue. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962); *Cowiche Canyon*, 118 Wn.2d at 809.

Under the TEDRA attorney fees award provisions, the trial court has discretion to award fees and other costs to any party in an estate dispute proceeding governed by Title 11 RCW. RCW 11.96A.150. The court may award any amount it "determines to be equitable." RCW 11.96A.150 (1). "In exercising its discretion under this section, the court may consider any and all factors that it deems to be relevant and appropriate, which factors may but need not include whether the litigation benefits the estate or trust involved." RCW 11.96A.150.

Here, Teresa's argument against attorney fees rests on the assumption that Jeannie breached her fiduciary duties and that Junior committed fraud. However, as shown above, the trial court did not err in its findings of fact or conclusions of law. Therefore we hold that the trial court did not abuse its discretion in awarding attorney fees to Junior and Jeannie.

ATTORNEY FEES ON APPEAL

A.    JUNIOR'S REQUEST FOR ATTORNEY FEES ON APPEAL

Junior requests attorney fees incurred on appeal, arguing that Teresa's appeal is frivolous and could not possibly result in reversal. He contends that Teresa had no admissible evidence to support her fraud claim and her claim that the Bridgeport property was an asset of the estate. Additionally, Junior argues that the claims raised in Teresa's TEDRA action were identical to those that raised in the prior civil suit, which were dismissed on appeal for mootness.

Under RAP 18.9(a), we can award attorney fees for the filing of frivolous appeals. "An appeal is frivolous when the appeal presents no debatable issues on which reasonable minds could differ and is so lacking in merit that there is no possibility of reversal." *Stiles v. Kearney*, 168 Wn. App. 250, 267, 277 P.3d 9 (citing *Mahoney v. Shinpoch,* 107 Wn.2d 679, 691, 732 P.2d 510 (1987)), *review denied*, 175 Wn.2d 1016 (2012).

Here, Teresa's fiduciary duty, fraud, and constructive trust claims were not "so lacking in merit that there [was] no possibility of reversal." *Id.* And the court that dismissed Teresa's prior civil suit against Junior found that a TEDRA action was appropriate for Teresa's claims. Therefore, we decline to grant Junior's request for attorney's fees incurred on appeal under RAP 18.9(a).

B.      JEANNIE'S REQUEST FOR ATTORNEY FEES APPEAL

Jeannie argues that "Since the trial court's award of attorney fees should be affirmed, Jeannie will have substantially prevailed in this appeal and is entitled to an award of attorneys' fees on appeal" and that "the party that substantially prevails on review" should be awarded costs under RAP 14.2.[10] Br. of Resp. (Jeannie L'Amarca) at 33-34; RAP 14.2.

We may grant an award of reasonable attorney fees on appeal to a party that requests it in its opening brief, as long as applicable law provides for such an award. RAP 18.1. RCW 11.96A.150, authorizing reasonable attorney fees in TEDRA actions, applies not only to trial courts, but also to "any court on an appeal." RCW 11.96A.1501); *In re Estate of Mower*, 193 Wn. App. 706, 729, 374 P.3d 180, *review denied*, 186 Wn.2d 1031 (2016). Therefore, like the trial court, we have discretion to award reasonable attorney fees in estate disputes.

Here, Jeannie is the prevailing party. Thus, we award Jeannie her reasonable attorney fees incurred on appeal.

We affirm.

---

[10] RAP 14.2 allows for an award of "costs" to the substantially prevailing party. RAP 14.3 defines "costs" as including statutory attorney fees.

No. 52049-4-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____, A.C.J.
Lee, A.C.J.

We concur:

_____
Worswick, J.

_____
Melnick, J.